The opinion in these cases proceed, as it seems to me, upon grounds entirely too narrow and artificial. The substance and spirit of the recent amendments of the Constitution have been sacrificed by a subtle and ingenious verbal criticism. “It is not the words of the law but the internal sense of it that makes the law: the letter of the law is the body; the sense and reason of the law is the soul.” Constitutional provisions, adopted in the interest of liberty, and for the purpose of securing, through National legislation, if need be, rights inhering in a state of freedom, and belonging to American citizenship, have been so construed as to defeat the ends the people desired to accomplish, which they attempted to accomplish, and which they supposed they had accomplished by changes in their fundamental law. By this I do not mean that the determination of these cases should have been materially controlled by considerations of mere expediency or policy. I mean only, in this form, to express an earnest conviction that the Court has departed from the familiar rule requiring, in the interpretation of constitutional provisions, that full effect be given, to the intent with which they were adopted.
The purpose of the first section of the act of Congress of March *234 1,1875, was to prevent race discrimination. It does not assume to define the general conditions and limitations under which inns, public conveyances and places of public amusement may be conducted, but only declares that such conditions and limitations, whatever they may be, shall not be applied by way of discrimination on account of race, color, or previous condition of servitude. The second section provides a penalty against any one denying, or aiding or inciting the denial, to any citizen that equality of right given by the first section, except for reasons by law applicable to citizens of every race or color and regardless of any previous condition of servitude.
There seems to be no substantial difference between my brethren and myself as to what was the purpose of Congress; for, they say that the essence of the law is, not to declare broadly that all persons shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances and theaters; but that such enjoyment shall not be subiect to any conditions applicable only to citizens of a particular race or color, or who had been in a previous condition of servitude. The effect of the statute, the Court says, is, that colored citizens, whether formerly slaves or not, and citizens of other races, shall have the same accommodations and privileges in all inns, public conveyances and places of amusement as are enjoyed by white persons, and vice versa.
The Court adjudges that Congress is without power, under either the Thirteenth or Fourteenth Amendment, to establish such regulations, and that the first and second sections of the statute are, in all their parts, unconstitutional and void.
Before considering the particular language and scope of these amendments it will be proper to recall the relations which, prior to their adoption, subsisted between the National Government and the institution of slavery, as indicated by the provisions of the Constitution, the legislation of Congress, and the decisions of this Court. In this mode we may obtain keys with which to open the mind of the people, and discover the thought intended to be expressed.
In section 2 of article 4 of the Constitution it was provided that “no person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of *235 any law or regulation therein, be discharged from such service or labor, but shall be delivered upon claim of the party to whom such service or labor may be due.” Under the authority of that clause Congress passed the fugitive slave law of 1793, establishing the mode for the recovery of a fugitive slave, and prescribing a penalty against any person knowingly and willingly obstructing or hindering the master, his agent or attorney, in seizing, arresting, and recovering the fugitive, or who should rescue the fugitive from him, or who should harbor or conceal the slave after notice that he was a fugitive.
In Prigg v. Commonwealth of Pennsylvania, 16 Pet., 539, this Court had occasion to define the powers and duties of Congress in reference to fugitives from labor. Speaking by Mr. Justice Story, the Court laid down these propositions:
That a clause of the Constitution conferring a right should not be so construed as to make it shadowy, or unsubstantial, or leave the citizen without a remedial power adequate for .its protection, when another mode, equally accordant with the words and the sense in which it was used would enforce and protect the right so granted.
That* Congress is not restricted to legislation for the exertion of its powers expressly granted; but, for the protection of rights guaranteed by the Constitution, it may employ, through legislation, such means, not prohibited, as are necessary and proper, or such as are appropriate, to attain the ends proposed.
That the Constitution recognized the master’s right of property in his fugitive slave, and, as incidental thereto, the right of seizing and recovering him, regardless of any State law, or regulation, or local custom whatsoever; and,
That the right of the master to have his slave, so escaping, delivered up on claim, being guaranteed by the Constitution, the fair implication was, that the National Government was clothed with appropriate authority and functions to enforce it.
The Court said: “The fundamental principle, applicable to all cases of this sort, would seem to be that when the end is required the means are given, and when the duty is enjoined the ability to perform it is contemplated to exist on the part of the functionary to whom it is entrusted.” Again: “It would be a strange anomaly and forced construction to suppose that the National Government meant to rely for the due fulfillment of *236 its own proper duties, and the rights which it intended to secure, upon State legislation, and not upon that of the Union. A fortiori, it would be more objectionable to suppose that a power, which was to be the same throughout the Union, should be confided to State sovereignty, which could not rightfully act beyond its own territorial limits.”
The act of 1793 was, upon these grounds adjudged to be a constitutional exercise of the powers of Congress.
It is to be observed, from the report of Prigg’s case, that Pennsylvania, by her attorney-general, pressed the argument that the obligation to surrender fugitive slaves was on the States and for the States, subject to the restriction that they should not pass laws or establish regulations liberating such fugitives; that the Constitution did • not take from the States the right to determine the status of all persons within their respective jurisdictions; that it was for the State in which the alleged fugitive was found to determine, through her Courts or in such modes as she prescribed, whether the person arrested was, in fact, a freeman or a fugitive slave; that the sole power of the general Government in the premises was, by judicial instrumentality, to restrain and correct, not to forbid and prevent in the absence of hostile State action; and that, for the general Government to assume primary authority to legislate on the subject of fugitive slaves, to the exclusion of the States, would be a dangerous encroachment on State sovereignty. But to such suggestions this Court turned a deaf ear, and adjudged that primary legislation by Congress to enforce the master’s right was authorized by the Constitution.
We next come to the fugitive slave act of 1850, the constitutionality of which rested, as did that of 1793, solely upon the implied power of Congress to enforce the master’s rights. The provisions of that act were far in advance of previous legislation. They placed at the disposal of the master seeking to recover his fugitive slave, substantially, the whole power of the Nation. It invested commissioners, appointed under the act, with power to summon the posse comitatus for the enforcement of its provisions, and commanded “all good citizens” to assist in its prompt and efficient execution whenever their services were required as part of the posse comitatus. Without going into the details of that act it is sufficient to say that Congress *237 omitted from it nothing which the utmost ingenuity could suggest as essential to the successful enforcement of the master’s claim to recover his fugitive slave. And this Court, in Ableman v. Booth, 21 How., 526, adjudged it to be “in all of its provisions fully authorized by the Constitution of the United States.”
The only other decision, prior to the adoption of the recent amendments, to which reference will be made, is Dred Scott v. Sanford, 19 How., 399. That suit was instituted in a Circuit Court of the United States by Dred Scott, claiming to be a citizen of Missouri, the defendant being a citizen of another State. Its object was to assert the title of himself and family to freedom. The defendant pleaded in abatement to the jurisdiction of the Court that Scott—being of African descent, whose ancestors, of pure African blood, were brought into this country and sold as slaves—was not a citizen. The only matter in issue, said the Court, was whether the descendants of slaves so imported and sold, when they should be emancipated, or who were born of parents who had become free before their birth, are citizens of a State in the sense in which the word “citizen” is used in the Constitution of the United States.
In determining that question the Court instituted an inquiry as to who were citizens of the several States at the adoption of the Constitution, and who, at that time, were recognized as the people whose rights and liberties had been violated by the British Government. The result was a declaration, by this Court, speaking through Chief Justice Taney, that the legislation and histories of the times, and the language used in the Declaration of Independence, showed “that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that instrument;” that “they had for more than a century before been regarded as beings of an inferior race, and altogether unfit to associate with the white race, either in social or political relations, and so far inferior that they had no rights which the white man was bound to respect, and that the negro might justly and lawfully be reduced to slavery for his benefit;” that he was “bought and sold, and treated as an ordinary article of merchandise and *238 traffic, whenever a profit could be made by it;” and, that “ this opinion was at that time fixed and universal in the civilized portion of the white race. It was regardad.as an axiom in morals as well as in politics, which, no one thought of disputing, or supposed to be open to dispute; and men in every grade and position in society daily and habitually acted upon it in their private pursuits, as well as in matters of public concern, without for a moment doubting the correctness of this opinion.”
The judgment of the Court was that the words “people of the United States” and “citizens,” meant the same thing, both describing “the political body who, according to our republican institution's, form the sovereignity and hold the power and conduct of the Government through their representatives;” that “they are what we familiarly call the the ‘sovereign people,’ and every citizen is one of this people and a constituent member of this sovereignity;” but, that the class of persons described in the plea in abatement did not compose a portion of this people, were not “included, and were not intended to be included, under the word ‘citizens’ in, the Constitution ;” that, therefore, they could “ claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States;” that “on the contrary, they were at that time considered as a subordinate and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the Government might choose to grant them.”
Such were the relations which, prior to the adoption of the Thirteenth Amendment, existed between the Government, whether National or State, and the descendants, whether free or in bondage, of those of African blood who had been imported into this country and sold as slaves.
The first section thereof provides that “neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United, States, or any place subject to their jurisdiction.” Its second section declares that “Congress shall have power to enforce this article by appropriate legislation.” This *239 amendment was followed by the Civil Rights Act of April 9, 1866, which, among other things, provided that “all persons born in the United States, and not subject to any foreign power, including Indians not taxed, are hereby declared to be citizens of the United States.” 14 Stat., 27.
The power of Congress, in this mode, to elevate the race thus liberated to the plane of National citizenship, was maintained by the supporters of the act of 1866 to be as full and complete as its power, by general statute, to make the children, being of full age, of persons naturalized in this country, citizens of the United States without going throúgh the process of naturalization. The act of 1866, in this respect, was also likened to that of 1843, in which Congress declared “ that the Stockbridge tribe of Indians, and each and every one of them, shall be deemed to be, and are thereby declared to be, citizens of the United States to all intents and purposes, and shall be entitled to all the rights, privileges and immunities of such citizens, and shall in all respects be subject to the laws of the United States.” If the act of 1866 was valid as conferring National citizenship upon all embraced by its terms, then the colored race, liberated by the Thirteenth Amendment, became citizens of the United States prior to the adoption of the Fourteenth Amendment. But, in the view which I take of the present case, it is not necessary to examine this question.
The terms of the Thirteenth Amendment are absolute and universal. They embrace every race which then was, or might thereafter be, within the United States. No race, as such, can be excluded from the benefits or rights thereby conferred. Yet it is historically true that that amendment was suggested by the condition, in this country, of that race which had been declared, by this Court, to have had—according to the opinion entertained by the most civilized portion of the white race at the time of the adoption of the Constitution—-“no rights which the white man was bound to respect,” none of the privileges or immunities secured by that instrument to citizens of the United States. It had reference, in a peculiar sense, to a people which (although the larger part of them were in slavery) had been invited by an act of. Congress to aid, by their strong right arms, in saving from overthrow a Government which, theretofore, by all of its departments, had treated them as an *240 inferior race, with no legal rights or privileges except such as the white race might choose to grant them.
These are the circumstances under which the Thirteenth Amendment was proposed for adoption. They are now recalled only that we may better understand what was in the minds of the people when that amendment was being considered, and what were the mischiefs to be remedied, and the grievances to be redressed.
We have seen that the power of Congress, by legislation, to enforce the master’s right to have his slave delivered up on claim was implied, from the recognition and guaranty in the National Constitution. But the power conferred by the Thirteenth Amendment does not rest upon implication or inference. Those who framed it were not ignorant of the discussion, covering many years of the country’s history, as to the constitutional power of Congress to enact the fugitive slave laws of 1793 and 1850. When, therefore, it was determined, by a change in the fundamental law, to uproot the institution of slavery wherever it existed in this land, and to establish universal freedom, there was a fixed purpose to place the power of Congress in the premises beyond the possibility of doubt. Therefore, ex industria, the power to enforce the Thirteenth Amendment by appropriate legislation, was expressly granted. Legislation for that purpose, it is conceded, may be direct and primary. But to what specific ends may it be directed? This Court has uniformly held that the National Government has the power, whether expressly given or not, to secure and protect rights conferred or guaranteed by the Constitution. (United States v. Reese. 92 U. S., 214; Strauder v. West Virginia, 100 U. S., 300.) That doctrine ought not now to be abandoned when the inquiry is not as to an implied power to protect the master’s rights, but what may Congress do, under powers expressly granted, for the protection of freedom and the rights necessarily inhering in a State of freedom.
The Thirteenth Amendment, my brethren concede, did something more than to prohibit slavery as an institution, resting upon distinctions of race, and upheld by positive law. They admit that it established and decreed universal civil freedom throughout the United States. But did the freedom thus aestablished involve nothing more than exemption from actul *241 slavery? Was nothing more intended than to forbid one man from owning another as property? 'Was it the purpose of the Nation simply to destroy the institution, and then remit the race, theretofore held in bondage, to the several States for such protection, in their civil rights, necessarily growing out of freedom, as those States, in their discretion, choose to provide? Were the States, against whose solemn protest the institution was destroyed, to be left perfectly free, so far as National interference was concerned, to make or allow discriminations against that race, as such, in the enjoyment of those fundamental rights that inhere in .a State of freedom? Had the Thirteenth Amendment stopped with the sweeping declaration, in its first section, against the existence of slavery and involuntary servitude, except for crime, Congress would have had the power, by implication, according to the doctrines of Prigg v. Commonwealth of Pennsylvania, repeated in Strauder v. West Virginia, to protect the freedom thus established, and consequently, to secure the enjoyment of such civil rights as were fundamental in freedom. But that it can exert its authority to that extent is now made clear, and was intended to be made clear, by the express grant of power contained in the second section of that amendment.
That there are burdens and disabilities which constitute badges of slavery and servitude, and that the express power delegated to Congress to enforce, by appropriate legislation, the Thirteenth Amendment, may be exerted by legislation qí a direct and primary character, for the eradication, not simply of the institution, but of its badges and incidents, are propositions which ought to be deemed indisputable. They lie at the. very foundation of the Civil Rights Act of 1866. Whether that act was fully authorized by the Thirteenth Amendment alone, without the support which it afterward received from the Fourteen Amendment, after the adoption of which it was re-enacted with some additions, the Court, in its opinion, says it is unnecessary to inquire. But I submit, with all respect to my brethren, that its constitutionality is conclusively shown by other portions of their opinion. It is expressly conceded by them that the Thirteenth Amendment established freedom; that there are burdens and disabilities, the necessary incidents *242 of slavery, which constitute its substance and visible form; that Congress, by the Act of 1866, passed in view of the Thirteenth Amendment, before the Fourteenth was adopted, undertook to remove certain burdens and disabilities, the necessary incidents of slavery, and to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property as is enjoyed by white citizens; that under the Thirteenth Amendment Congress has to do with slavery and its incidents; and that legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not.
These propositions being conceded, it is impossible, as it seems to me, to question the constitutional validity of the Civil Rights Act of 1866. I do not contend that the Thirteenth Amendment invests Congress with authority, by legislation, to regulate the entire body of the civil rights which citizens enjoy, or may enjoy, in the several States. But I do hold that since slavery, as the Court has repeatedly declared, was the moving or principal cause of the adoption of that amendment, and since that institution rested wholly upon the inferiority, as a race, of those held in bondage, their freedom necessarily involved immunity from, and protection against, all discrimination against them, because of their race, in respect of such civil rights as belong to freemen of other races. Congress, therefore, under its express power to enforce that amendment, by appropriate legislation, may enact laws to protect that people against the deprivation, 0⅞ account of their race, of any civil rights enjoyed by other freemen in the same State; and such legislation may be of a direct and primary character, operating upon States, their officers and agents, and, also, upon, at least, such individuals and corporations as exercise public functions and wield power and authority under the State.
By way of testing the correctness of this position, let us suppose that, prior to the adoption of the Fourteenth Amendment, a State had passed a statute denying to freemen of African de *243 scent, resident within its limits, the same rights which were accorded to white persons, of making or enforcing contracts, or of inheriting, purchasing, leasing, selling and conveying property; or a statute subjecting colored people to severer punishment for particular offenses than was prescribed for white persons, or excluding that race from the benefit of the laws exempting homesteads from execution. Recall the legislation of 1865-6 in some of the States, of which this Court, in the Slaughter-House Cases, said, that it imposed upon the colored race onerous disabilities and burdens; curtailed their rights in the pursuit of life, liberty and property to such an extent that their freedom was of little value; forbade them to appear in the towns in any other character than menial servants; required them to reside on and cultivate the soil, without the right to purchase or own it; excluded them from many occupations of gain; and denied them the privilege of giving testimony in the Courts where a white man was a party. (16 Wall., 57.) Can there be any doubt that all such legislation might have been reached by direct legislation upon the part of Congress under its express power to enforce the Thirteenth Amendment? Would any Court have hesitated to declare that such legislation imposed badges of servitude in conflict with the civil freedom ordained by that amendment? That it would have been also in conflict with the Fourteenth Amendment because inconsistent with the fundamental rights of American citizenship, does not prove that it would have been consistent with the Thirteenth Amendment.
What has been said is sufficient to show that the power of Congress under the Thirteenth Amendment is not necessarily restricted to legislation against slavery as an institution upheld by positive law, but may be exerted to the extent, at least, of protecting the race, so liberated, against discrimination, in respect of legal rights belonging to freemen, where such discrimination is based upon race.
It remains now to inquire what are the legal rights of colored persons in respect of the accommodations, privileges and facilities of public conveyances, inns and places of public amusement?
First—As to public conveyances on land and water. In New Jersey Steam Navigation Co. v. Merchants Bank, 6 How., 382, this *244 Court, speaking by Mr. Justice Nelson, said that a common carrier is “in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned.” To the same effect is Munn v. Illinois, 94 U. S., 130. In Olcott v. Supervisors, 16 Wall., 694, it was ruled that railroads are public highways, established by authority of the State, for the public use; that they are none the less public highways because controlled and owned by private corporations; that it is a part of the function of government to make and maintain highways for the conveyance of the public; that no matter who is the agent, and what is the agency, the function performed is that of the State; that although the owners may be private companies, they may be compelled to permit the public to use these works in a manner in which they can be used; that, upon these grounds alone, have the Courts sustained the investure of railroad corporations with the State’s right of eminent domain, or the right of municipal corporations, under legislative authority, to assess, levy and collect taxes to aid in the construction of railroads.
So in the Township of Queensbury v. Culver, 19 Wall., 91, it was said that a municipal subscription of railroad stock was in aid of the construction and maintenance of a public highway, and for the promotion of a public use. Again, in Township of Pine Grove v. Tolcott, 19 Wall., 676: “Though the corporation [railroad] was private, its work was public, as much so as if it weie to be constructed by the State.” To the like effect are numerous adjudications in the State Courts, with which the profession is familiar. The Supreme Judicial Court of Massachusetts in Inhabitants of Worcester v. The Western R. R. Corporation, 4 Met., 566, said, in reference to a certain railroad: “The establishment of that great thoroughfare is regarded as a public work, established by public authority, intended for the public use and benefit, the use of which is secured to the whole community, and constitutes, therefore, like a canal, turnpike, or highway, a highway, a public easement. * * * It is true that the real and personal property necessary to the establishment and management of the railroad is vested in the corporation; but it is in trust for the public.” In Erie County v. Casey, 26 Penn. St., 285, the Court, re *245 ferring to an act repealing the charter of the railroad, and under which the State took possession of the road, said, speaking by Black, J.: “ It is a public highway, solemnly devoted to public use. When the lands were taken it was for such use, or they could not have been taken at all. * * * Railroads established on land taken by the right of eminent domain, by authority of the commonwealth, created by her laws as thoroughfares for commerce, are her highways. No corporation has property in them, though it may have franchises annexed to and exercisable within them.” In many Courts it has been held that because of the public interest in such a corporation, the land of a railroad company cannot be levied on and sold under execution by a creditor. The sum of the adjudged cases is, that a railroad corporation is a governmental agency, created primarily for public purposes, and subject to be controlled for the public benefit. It is upon that ground that the State, when unfettered by contract, may regulate, in its discretion, the rates of fares of passengers and freight. And upon this ground, too, the State may regulate the entire management of railroads in all matters affecting the convenience and safety of the public, as, for example, by regulating speed, compelling stops of prescribed length at stations, and prohibiting discriminations and favoritism. If the corporation neglect or refuse to discharge its duties to the public, it may be coerced to do so by appropriate proceedings in the name or in behalf of the State.
Such being the relations these corporations hold to the public, it would seem that the right of the colored person to use an improved public highway, upon terms accorded to freemen of other races, is as fundamental in the state of freedom established in this country, as are any of the rights which my brethren concede to be so far fundamental as to be deemed the essence of civil freedom. “ Personal liberty consists,” says Blackstone, “in the power of locomotion, of changing situation, or removing one’s person to whatever place one’s own inclination may direct, without restraint, unless by due course of law.” But of what valúe is this right of locomotion, if it may be clogged by such burdens as Congress intended by the act of 1875 to remove. They are burdens which lay at the very foundation of the institution of slaver as it once existed. *246 They are not to be sustained, except upon the assumption that there is still, in this land of universal liberty, a class which may yet be discriminated against, even in respect of rights of character so essential and so supreme, that, deprived of their enjoyment, in common with others, a freeman is not only branded as one inferior and infected, but, in the competitions of life, is robbed of some of the most necessary means of existence, and all this solely because they belong to a particular race which the Nation has liberated. The Thirteenth Amendment alone, obliterated the race line, so far as all rights fundamental in a state of freedom are concerned.
Second—As to inns. The same general observations which have been made as to railroads are applicable to inns. The word “inn” has a technical legal signification. It means, in the act of 1875, just what it meant at common law. A mere private boarding-house is not an inn, nor is its keeper subject to the responsibilities, or entitled to the privileges of a common innkeeper. “To constitute one an innkeeper, within the legal force of that term, he must keep a house of entertainment or lodging for all travelers or wayfarers who might choose to accept the same, being of good character or conduct.” (Redfield on Carriers, etc., Sec. .575.) Says Judge Story: “An innkeeper may be defined to be the keeper of a common inn for the lodging and entertainment of travelers and passengers, their horses and attendants. An innkeeper is bound to take in all travelers and wayfaring persons, and to entertain them, if he can accommodate them, for a reasonable compensation; and he must guard their goods with proper diligence. * * If an innkeeper improperly refuses to receive or provide for a guest, he is liable to be indicted therefor. * * They (carriers of passengers) are no more at liberty to refuse a passenger, if they have sufficient room and accommodations, than an innkeeper is to refuse suitable room and accommodations to a guest.” (Story on Bailments, Secs. 475, 476.) Said Mr. Justice Coleridge in Rex v. Ivens, 7 Carrington & Payne, 213, (32 E. C. L., 495): “An indictment lies against an innkeeper who refuses to receive a guest, he having at the time room in his house; and either the price of the guest’s entertainment being tendered to him, or such circumstances occurring as will dispense with that tender. This law is found in good sense. *247 The innkeeper is not to select his guests. He has no right to say to one, you shall come to my inn, and to another, you shall not, as every one coming and conducting himself in a proper manner has a right to be received; and for this purpose innkeepers are 'a sort of public servants, they having in return a kind of privilege of entertaining travelers and supplying them with what they want.”
These authorities are sufficient to show that a keeper of an inn is in the exercise of a quasi public employment. The law gives him special privileges and he is charged with certain duties and responsibilities to the public. The public nature of his employment forbids him from discriminating against any person asking admission as a guest on account of the race or color of that person.
Third—As to places of public amusement. It may be argued that the managers of such places have no duties to perform with which the public are, in any legal sense, concerned, or with which the public have any right to interfere; and that the exclusion of a black man from a place of public amusement, on account of his race, or the denial to him, on that ground, of equal accommodations at such places, violates no legal right for the vindication of which he may invoke the aid of the Courts. My answer to that argument is, that places of public amusement, within the meaning of the act of 1875, are such as are established and maintained under direct license of the law. The authority to establish and maintain them comes from the public. ' The colored race is a part of that public. The local government granting the license represents them as well as all other races within its jurisdiction. A license from the public to establish a place of public amusement, imports, in law, equality of right, at such places, among all the mem. bers of that public. This must be so, unless it be—which I deny—that the common municipal government of all the people may, «in the exertion of its powers, conferred for the benefit of all, discriminate or authorize discrimination against a particular race, solely because of its former condition of servitude.
I also submit, whether it can be said—in view of the doctrines of this Court as announced in Munn v. State of Illinois, 92 U. S., 123, and reaffirmed in 94 U. S., 178—that .the man *248 agement of places of public amusement is a purely private matter, with which Government has no rightful concern. In the Munn case the question was, whether the State of Illinois could fix, by law, the maximum of charges for the storage of grain in certain warehouses in that State—the private property of individual citizens. After quoting a remark attributed to Lord Chief Justice Hale, to the effect that when private property is “ affected with a public interest it ceases to be juris pri-vati only,” the Court says: “Property does not become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest he, in effect, grants the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use, he must submit to control.” The doctrines of Munn v. Illinois, have never been modified by this Court, and I am justified, upon the authority of that case, in saying that places of public amusement, conducted under the authority of the law, are clothed with a public interest, because used in a manner to make them of public consequence and to affect the community at large. The law may, therefore, regulate, to some extent, the mode in which they shall be conducted, and, consequently, the public have rights in respect of such places, which may be vindicated by the law. It is consequently not a matter purely of private concern.
Congress has not, in these matters, entered the domain of State control and supervision. It does not assume to prescribe the general conditions and limitations under which inns, public conveyances, and places of public amusement, shall be conducted or managed. It simply declares, in effect, that since the Nation has established universal freedom in this country, for all time, there shall be no discrimination, based merely upon race or color, in respect of the legal rights in the accmmodations and advantages of public conveyances, inns, and places of public amusement.
I am of opinion that such discrimination 'is a badge of servitude, the imposition of which Congress may prevent un *249 der its power, through appropriate legislation, to enforce the Thirteenth Amendment; and, consequently, without reference to its enlarged power under the Fourteenth Amendment, the act of March 1, 1875, is not, in my judgment, repugnant to the Constitution.
It remains now to consider these cases with reference to the power Congress has possessed since the adoption of the Fourteenth Amendment.
Before the adoption of the recent amendments it has become, as we have seen, the established doctrine of this Court that negroes, whose ancestors had been imported and sold as slaves, could not become citizens of a State, or even the United States, with the rights and privileges guaranteed to citizens by the National Constitution; further, that one might have all the rights and privileges of a citizen of a State without being a citizen in the sense in which that word was used in the National Constitution, and without being entitled to the privileges and immunities of citizens of the several States. Still, further; between the adoption of the Thirteenth Amendment, and the proposal by Congress of the Fourteenth Amendment, on June 16, 1866, the statute books of several of the States, as we have seen, had become loaded down with enactments which, under the guise of Apprentice, Vagrant, and Contract Regulations, sought to keep the colored race in a condition, practically, of servitude. It was openly announced that whatever rights persons of that race might have, as freemen, under the guarantees of the National Constitution, they could not become citizens of a State, with the rights belonging to citizens, except by the consent of such State; consequently, that their civil rights, as citizens of the State, depended entirely upon State legislation. To meet this new peril to the black race, that the purposes of the Nation might not be doubted or defeated, and by way of further enlargement of the power of Congress, the Fourteenth Amendment was proposed for adoption.
Remembering that this Court, in the Slaughter-House Cases, declared that the one pervading purpose found in all the recent amendments, lying at the foundation of each, and without which none of them would have been suggested, was “the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman *250 and citizen from the oppression of those who had formerly exercised unlimited dominion over him”—that each amendment was addressed primarily to the grievances of that race—let us proceed to consider the language of the Fourteenth Amendment.
Its first and fifth sections are in these words:
“Sec. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. * * *
“Sec. 5. That Congress shall have power to enforce, by appropriate legislation, the provisions of this article.”
It was adjudged in Strauder v. West Virginia and ex parte Virginia, 100 U. S., 307, 345, and my brethren concede, that positive rights and privileges were intended to be secured, and are in fact secured by the Fourteenth Amendment.
But when, under what circumstances, and to what extent, may Congress, by means of legislation, exert its power to enforce the provisions oí this amendment? The logic of opinion of the majority of the Court—the foundation upon which its whole reasoning seems to rest—Is, that the general government cannot in advance of hostile State laws or hostile State proceedings, actively interfere for the protection of any of the rights, privileges and immunities secured by.the Fourteenth Amendment. It is said that such rights, privileges and immunities are secured by way of prohibition against State laws and State proceedings affecting such rights and privileges, and by power given to Congress to legislate for the purpose of carrying such prohibition into effect; also, that congressional legislation must necessarily be predicated upon such supposed State laws or State proceedings, and be directed to the correction of their operation and effect.
In illustration of its position, the Court refers to the clause of the Constitution forbidding the passsage by a State of any law impairing the obligation of contracts. That clause does not, I submit, furnish a proper illustration of the scope and effect of the fifth section of the Fourteenth Amendment. No *251 express power is given Congress to enforce, by primary direct legislation, the prohibition upon State laws impairing the obligation of contracts. Authority is, indeed, conferred to enact all necessary and proper laws for carrying into execution the enumerated powers of Congress and all other powers vested by the Constitution in the Government of the United States or in any department or officer thereof. And, as heretofore shown, there is also, by necessary implication, power in Congress, by legislation, to protect a right derived from the National Constitution. But a prohibition uponja State is not a power in Congress or in the National Government. It is simply a denial of power to the State. And the only mode in which the inhibition upon State laws impairing the obligation of contracts can be enforced, is, indirectly, through the Courts, in suits where the parties raise some question as to the constitutional validity of such laws. The judicial power of the United States extends to such suits for the reason that they are suits arising under the Constitution. The Fourteenth Amendment presents the first instance in. our history of the investiture of Congress with affirmative power, by legislation, to enforce an express prohibition upon the States. It is not said that the judicial power of the Nation may be exerted for the enforcement of that amendment. No enlargement of the judicial power was required, for it is clear that had the fifth section of the Fourteenth Amendment been entirely omitted, the judiciary could have stricken down all State laws and nullified all State proceedings in hostility to rights and privileges secured or recognized by that amendment. The power given is, in terms, by Congressional legislation, to enforce the provisions of the amendment.
The assumption that this amendment consists wholly of prohibitions upon State laws and State proceedings in hostility to its provisions, is unauthorized by its language. The first clause of the first section—“all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside”—is of a distinctly affirmative character. In its application to the colored race, previously liberated, it created and granted, as well citizenship of the United States, as citizenship of the State in which they respectively resided. It introduced *252 all of that race, whose ancestors had been imported and sold as slaves, at once, into the political community known as the “People of the United States.” They became, instantly, citizens of the United States, and of their respective States. Further, they were brought, by this supreme act of the Nation, within the direct operation of that provision of the Constitution which declares that “the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.” Art. IV, Sec. 2.
The citizenship thus acquired, by that race, in virtue of an affirmative grant by the Nation, may be protected, not alone by the judicial branch of the Government, but by Congressional legislation of a primary, direct character; this, because the power of Congress is not restricted to the enforcement of prohibitions upon State laws or State action. It is, in terms distinct and positive, to enforce “ the provisions of this article” of amendment; not simply those of a prohibitive character, but the provisions—all of the provisions—affirmative and prohibitive, of the amendment. It is, therefore, a grave misconception to suppose that the fifth section of the amendment has reference exclusively to express prohibitions upon State laws or State action. If any right was created by that amendment, the grant of power, through appropriate legislation, to enforce its provisions, authorizes Congress, by means of legislation, operating throughout the entire Union, to guard, secure and protect that right.
It is, therefore, an essential inquiry what, if any, right, privilege or immunity was given, by the Nation, to colored persons, when they were made citizens of the State in which they reside? Did the National grant of State citizenship to that race, of its own force, invest them with any rights, privileges and immunities whatever? That they became entitled, upon the adoption of the Fourteenth Amendment, “to all privileges and immunities of citizens in the several States,” within the meaning of Sec. 2 of Art. IV of the Constitution, no one, I suppose, will for a moment question. What are the privileges and immunities to which, by that clause of the Constitution, they became entitled ? To this it may be answered, generally, upon the authority of the adjudged cases, that they are those which are fundamental in citizenship in a free government, *253 “common to the citizens in the latter States under their constitutions and laws b}' virtue of their being citizens.” Of that provision it has been said, with the approval of this Court, that no other one in the Constitution has tended so strongly to constitute the citizens of the United States one people. Ward v. Maryland, 12 Wall., 430; Corfield v. Coryell, 4 Wash. C. C., 371; Poul v. Virginia, 8 Wall., 180; Slaughter-House Cases, 16 Id., 77.
Although this Court has wisely forborne any attempt, by a comprehensive definition, to indicate all of the privileges and immunities to which the citizens of each State are entitled, of right, to enjoy in the several States, I hazard nothing, in view of former adjudications, in saying that no State can sustain her denial to colored citizens of other States, while within her limits, of privileges or immunities, fundamental in republican citizenship, upon the ground that she accords such privileges and immunities only to her white citizens and withholds them from her colored citizens. The colored citizens of other States, within the jurisdiction of that State, could claim, under the Constitution, every privilege and immunity which that State secures to her white citizens. Otherwise it would be in the power of any State, by discriminating class legislation, against its own citizens of a particular race or color, to withhold from citizens of other States, belonging to that proscribed race, when within her limits, privileges and immunities of the character regarded by all Courts as fundamental in citizenship; and that, too, when the constitutional guaranty is that the citizens of each State shall be entitled to “all privileges and immunities of citizens of the several States.” No State may, by discrimination against a portion of its own citizens of a particular race, in respect of privileges and immunities fundamental in citizenship, impair the constitutional right of citizens of other States, of whatever race, to enjoy in that State all such privileges and immunities as are there accorded to her most favored citizens. A colored citizen of Ohio or Indiana, being in the jurisdiction of Tennessee, is entitled to enjoy any privilege or immunity, fundamental in citizenship, which is given to citizens of the white race in the latter State. It is not to be supposed that any one will controvert this proposition.
But what was secured to colored citizens of the United States —as between them and their respective States—-by the grant *254 to them of State citizenship? With what rights, privileges or immunities did this grant from the Nation invest them? There is one, if there be no others—exemption from race discrimination in respect of any civil right belonging to citizens of the white race in the same State. That, surely, is their constitutional privilege when within the jurisdiction of other States. And such must be their constitutional right, in their own State, unless the recent amendments be “splendid baubles,” thrown out to delude those who deserved fair and generous treatment at the hands of the Nation. Citizenship in this country necessarily imports equality of civil rights among citizens of every race in the same State. It is fundamental in American citizenship that, in respect of such rights, there shall be no discrimination by the State, or its officers, or by individuals or corporations exercising public functions or authority, against any citizen because of his race or previous condition of servitude. In U. S. v. Cruikshank, 92 U. S., 555, it was said that “ the equality of rights of citizens is a principle of republicanism.” And in Ex parte Virginia, 100 U. S., 334, the emphatic language of this Court is, that “one great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States.” So, in Strauder v. West Virginia, Ib., 306, the Court, alluding to the Fourteenth Amendment, said: “This is one of a series of constitutional provisions having a common purpose, namely,, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy.” Again, in Neal v. Delaware, 103 U. S., 386, it was ruled that this amendment was designed, primarily, “ to secure to the colored race, thereby invested with the rights, privileges and responsibilities of citizenship, the enjoyment of all the civil rights that, under the law, are enjoyed by white persons.”
Much light is thrown upon this part of the discussion by the language of this Court in reference to the Fifteenth Amendment. In U. S. v. Cruikshank it was said: “ In U. S. v. Reese, 92 U. S., 214, we held that the Fifteenth Amendment has invested the citizens of the United States with a new constitutional right, *255 which is, exemption from discrimination in the exercise of the elective franchise, on account of race, color or previous condition of servitude. From this it appears that the right of suffrage is not a necessary attribute of National citizenship, but that exemption from discrimination in the exercise of that right on account of race, etc., is. The right 'to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the-United States, but the last has been.” Here, in language at once clear and forcible, is stated the principle for which I contend. It can hardly be claimed that exemption from race discrimination, in respect of civil rights, against those to whom State citizenship was granted by the Nation, is any less for the colored race a new constitutional right, derived from and secured by the National Constitution, than is exemption from such discrimination in the exercise of the elective franchise. It cannot be "that the latter is an attribute of National citizenship, while the other is not essential in National citizenship, or fundamental in State citizenship.
If, then, exemption from discrimination, in respect of civil rights, is a new constitutional right, secured by the grant of State citizenship to colored citizens of the United States, why may not the Nation, by means of its own legislation of a primary, direct character, guard, protect and enforce that right? It is a right and privilege which the Nation conferred. It did not come from the States in which those colored citizens reside. It has been the established doctrine of this Court during all its history, accepted as vital to the National supremacy, that Congress, in the absence of a positive delegation of power to the State Legislatures, may, by legislation, enforce and protect any right derived from or created by the National Constitution. It was so declared in Prigg v. Commonwealth of Pennsylvania. It was reiterated in U. S. v. Reese, 92 U. S., 214, where the Court said that “rights and immunities created by and depending upon the Constitution of the United States can be protected by Congress. The form and manner of the protection may be such as Congress, in the legitimate exercise of its discretion, shall provide. These may be varied to meet the necessities of the particular right to be protected.” It was *256 distinctly re-affirmed in Strauder v. West Virginia, 100 U. S., 310, where we said that “a right or immunity created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress.” Will any one claim, in view of the declaration of this Court jn former cases, or even without them, that exemption of colored citizens, within their States, from race discrimination, in respect of the civil rights of citizens, is not an immunity created or derived from the National Constitution?
This Court has always given a broad and liberal construction to the Constitution, so as to enable Congress, by legislation, to enforce rights secured by that instrument. The legislation Congress may enact, in execution of its power to enforce the provisions of this amendment, is that which is appropriate to protect the right granted. Under given circumstances, that which the Court characterizes as corrective legislation might be sufficient. Under other circumstances primary direct legislation may be required. But it is for Congress, not the judiciary, to say which is best adapted to the end to be attained. In U S. v. Fisher, 2 Cr., 358, this Court said that “Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution.” “The sound construction of the Constitution,” said Chief Justice Marshall, “must allow to the National legislature that discretion, with respect to the means by which the powers, it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional.” McCulloch v. Maryland, 4 Wh., 423.
Must these rules of construction be now abandoned? Are the powers of the National legislature to be restrained in proportion as the rights and privileges, derived from the Nation, are more valuable? Are constitutional provisions enacted to secure the dearest rights of freemen and citizens, to be subjected to that rule of construction, applicable to private instruments, which requires that the words to be interpreted must *257 be taken most strongly against those who employ them? Or, shall it be remembered that “a constitution of government, founded by the people for themselves and their posterity, and for objects of the most momentous nature, for perpetual union, for the establishment of justice, for the general welfare, and for a perpetuation of the blessings of liberty, necessarily requires, that every interpretation of its powers should have a constant reference to these objects? No interpretation of the words in which those powers are granted, can be a sound one, which narrows down their ordinary import so as to defeat those objects.” 1 Story Const., Sec. 422.
The opinion of the Court, as I have said, proceeds upon the ground that the power of Congress to legislate for the protection of the rights and privileges secured by the Fourteenth Amendment cannot be brought into activity except with the view, and as it may become necessary, to correct and annul State laws and State proceedings in hostility to such rights and privileges. In the absence of State laws or State action, adverse to such rights and privileges, the Nation may not actively interfere for their protection and security. Such I understand to be the position of my brethren. If the grant to colored citizens of the United States of citizenship in their respective States, imports exemption from race discrimination in their States, in respect of the civil rights belonging to citizenship, then, to hold that the amendment remits that right to the States for their protection, primarily, and stays the hands of the Nation, until it is assailed by State laws or State proceedings, is to adjudge that the amendment, so far from enlarging the powers of Congress—as we have heretofore said it did —not only curtails them, but reverses the policy which the General Government has pursued from its very organization.
Such an interpretation of the amendment is a denial to Congress of the power of appropriate legislation, to enforce one of its provisions. In view of the circumstances under which the recent amendments were incorporated into the Constitution, and especially in view of the peculiar character of the new rights they created and secured, it ought not to be presumed that the General Government has abdicated its authoritj'-, by National legislation, direct and primary in its character, to guard and protect privileges and immunities secured by that instrument. Such an interpretation of the Constitution ought not to be accepted if it be possible to avoid it. Its acceptance would lead to this anomalous result: that whereas, prior to the amendments, Congress, with the sanction of this Court, passed the most stringent laws—operating directly and primarily States and their officers and as well as indi *258 viduals—in vindication of slavery and the right of the master, it may not now, by legislation of a like primary and direct character, guard, protect and secure the freedom established, and the most essential right of the citizenship granted, by the constitutional amendments.
I venture, with all respect for the opinion of others, to insist that the National Legislature may, without transcending the limits of the Constitution, do for human liberty and the fundamental rights of American citizenship what it did, with the sanction of this Court, for the protection of slavery and the rights of masters of fugitive slaves. If fugitive slave laws, providing modes and prescribing penalties, whereby the master could seize and recover his fugitive slave, were legitimate exertions of an implied power to protect and enforce a right recognized by the Constitution, why shall the hands of Congress be tied, so that—under an express power, by appropriate legislation, to enforce a constitutional provision, granting citizenship—it may not, by means of direct legislation, bring the whole power of this Nation to bear upon States and their officers, and upon such individuals and corporations exercising public functions as assume to abridge, impair or deny rights confessedly secured by the supreme law of the land?
It does not seem to me that the fact that by the second clause of the first section of the Fourteenth Amendment, the States are expressly prohibited from making or enforcing laws abridging the privileges and immunities of citizens of the United States, furnishes any sufficient reason for holding or maintaining that the amendment was intended to deny Congress the power, by general, primary and direct legislation, of protecting citizens of the United States, being also citizens of their respective States, against discrimination, in respect of their rights as citizens, founded on race, color -or previous condition of servitude.
Such an interpretation of the amendment is plainly repugnant to its fifth section, conferring upon Congress power, by appropriate legislation, to enforce not merely the provisions containing- prohibitions upon the States, but all of the provisions of the amendment, including the provisions, express and implied, of the grant of citizenship, in the first clause of the first section of the article. This alone is sufficient for holding that Congress is not restricted to the enactment of laws adapted to counteract and redress the operation of State legislation, or the action of State officers of the character prohibited by the amendment. It was perfectly well known that the great danger to the equal enjQyment by citizens of their rights, as citizens, was to be apprehended not altogether from unfriendly State legislation, but from the hostile action of corporations *259 and individuals in the States. And it is to be presumed that it was intended, by that section, to clothe Congress with power and authority to meet that danger. If the rights intended to be secured by the act of 1875 are such as belong to the citizen, in common or equally with other citizens in the same State, then it is not to be denied that such legislation is appropriate to the end which Congress is authorized to accomplish, viz., to protect the citizen, in respect of such rights, against discrimination on account of his race.
As to the prohibition in the Fourteenth Amendment upon the making or enforcing of State laws abridging the privileges of citizens of the United States, it was impossible for any State to have enforced laws of that character. The judiciary could have annulled all such legislation under the provision that the Constitution shall be the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding. The States were already under an implied prohibition not to abridge any privilege or immunity belonging to citizens of the United States as such. Consequently, the prohibition upon State laws hostile to the rights belonging to citizens of the United States, was intended only as an express limitation on the powers of the States, and was not intended to diminish, in the slightest degree, the authority which the Nation has always exercised, of protecting, by means of its own direct legislation, rights created or secured by the Constitution. The purpose not to diminish the National authority is distinctly negatived by the express grant of power, by legislation, to enforce every provision of the amendment, including that which, by the grant of citizenship in the State, secures exemption from race discrimination in respect of the civil rights of citizens.
It is said that any interpretation of the Fourteenth Amendment different from that adopted by the Court would authorize Congress to enact a municipal code for all the States, covering every matter affecting the life, liberty and property of the citizens of the several States. Not so. Prior to the adoption of that amendment the constitutions of the several States, without, perhaps, an exception, secured all persona against, deprivation of life, liberty or property, otherwise than by due process of law, and, in some form, recognized the right of all persons to the equal protection of the laws. These rights, therefore, existed before that amendment was proposed or adopted. If, by reason of that fact, it be assumed that protection in these rights of persons still rests, primarily, with the States, and that Congress may not interfere except to enforce, by means of corrective legislation, the prohibitions upon State laws or State proceedings inconsistent with those rights, it does not at all follow *260 that privileges which have been granted by the Nation may not be protected by primary legislation upon the part of Congress.
The rights and immunities of persons recognized in the prohibitive clauses of the amendments were always under the protection, primarily, of the States, while rights, created by or derived from the United States, have always been, and, in the nature of things, should always be, primarily, under the protection of the General Government. Exemption from race discrimination in respect of the civil rights which are fundamental in citizenship in a republican government,, is, as we have seen, a new constitutional right, created by the Nation, with express power, in Congress, by legislation, to enforce the constitutional provision from which it is derived. If, in some sense, such race discrimination is a denial of the equal protection of the laws, within the letter of the last clause of the first section, it cannot be possible that a mere prohibition upon State denial of such equal protection to persons within its jurisdiction, or a prohibition upon State laws abridging the privileges and immunities of citizens of the United States, takes from the Nation the power which it has uniformly exercised of protecting, by primary, direct legislation, these privileges and immunities which existed under the Constitution before the adoption of the Fourteenth Amendment, or which have been created by that amendment in behalf of those thereby made citizens of their respective States.
It was said of Dred Scott v. Sandford, that this Court in that case, overruled the action of two generations, virtually inserted a new clause in the Constitution, changed its character, and made a new departure in the workings of the Federal Government. I may be permitted to say that if the recent amendments are so construed that Congress may not, in its own discretion, and independently of the action or non-action of the States, provide, by legislation, of a primary and direct character, for the security of rights created by the national Constitution; if it be adjudged that the obligation to protect the fundamental privileges and immunities granted by the Fourteenth Amendment to citizens residing in the several States, rests primarily, not on the Nation, but on the States; if it be further adjudged, that individuals and corporations, exercising public functions, may, without-liability to direct primary legislation on the part of Congress, make the race of citizens the ground for denying them that equality of civil rights which the Constitution ordains as a principle of republican citizenship, then, not only the foundations upon which the National supremacy has always securely rested will be materially disturbed, but we shall enter upon an era of constitutional law, when the rights of freedom and American citizenship cannot receive from the Nation that *261 protection which heretofore was accorded to slavery and the rights of the master.
But if it were conceded that the power of Congress could not be brought into activity until the rights specified in the act of 1875, had been abridged or denied by some State law or State action, I maintain that the decision of the Court is erroneous. There has been adverse State action within the Fourteenth Amendment as heretofore interpreted by this Court. I allude to Ex parte Virginia, supra. It appears in that case, that one Cole, Judge of a County Court, was charged with the duty, by the laws of Virginia, of selecting grand and petit jurors. The law of the State did not authorize or permit him, in making such selections, to discriminate against colored citizens because of their race. But he was indicted in the Federal Court, under the act of 1875, for making such discriminations. The Attorney-General of Virginia contended before us, that the State had done its duty, and had not authorized or directed that County Judge to do what he was charged with having done, and, consequently, that the State had not denied to the colored race the equal protection of the laws, and the act of Cole must, therefore, be deemed his individual act, in contravention of the will of the State.
Plausible as this argument was, it failed to convince this Court, and after saying that the Fourteenth Amendment had reference to the political body denominated a State, “by whatever instruments or in whatever modes that action may be taken,” and that a State acts by its legislative, executive and judicial authorities, and can act in no other way, we proceeded: “The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position, under a State government, deprives another of property, life or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and, as he acts under the name and for the State, and is clothed with the State’s power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or evade it. But the constitutional amendment was ordained for a purpose. It was to secure equal rights to all persons, and to insure to all persons the enjoyment of such rights, power was given to Congress to enforce its provisions by appropriate legislation. Such legislation must act upon persons, not upon the abstract thing denominated a State, but upon the persons who are the agents of the State, in the denial of the rights which were intended to be secured.” 100 U. S., 346, 347.
*262 In every material sense applicable to the practical enforcement of the Fourteenth Amendment, railroad corporations, keepers of inns, and managers of places of public amusement, are agents of the State, because amenable, in respect of their public duties and functions, to public regulation. It seems to me that within the principles settled in Ex parte Virginia, a denial, by these instrumentalities of the State, to the citizen, because of his race, of that equality of civil rights secured to him by law, is a denial by the State within the meaning of the Fourteenth Amendment. If it be not, then that race is left, in respect of the civil rights under discussion, practically at the mercy of corporations and individuals, wielding power under public authority.
But the Court says that Congress did not, in the act of 1866, assume, under the authority given by the Thirteenth Amendment, to adjust what may be called the social rights of men and races in the community. I agree that government has nothing to do with social, as distinguished from technically legal, rights of individuals. No government ever has brought, or ever can bring, its people into social intercourse against their wishes. Whether one person will permit or maintain social relations with another, is a matter with which government has no concern. I agree that if one citizen chooses not to hold social intercourse with another, even upon grounds of race, he is not, and cannot be made amenable to the law for his conduct in that regard; for no legal right of a citizen is violated by the refusal of others to maintain merely social relations with him. What I affirm is, that no State, nor the officers of any State, nor any corporation or individual wielding power under State authority for the public benefit or the public convenience, can, consistently either with the freedom established by the fundamental law, or with that equality of civil rights which now belongs to every citizen, discriminate against freemen or citizens, in their civil rights, because of their race, or because they once labored under disabilities imposed upon them as a race.
The rights which Congress by the act of 1875. endeavored to secure and protect are legal, not social rights. The right, for instance, of a colored citizen to use the accommodations of a public highway, upon the same terms as are permitted to white citizens, is no more a social right than his right, under the law, to use the public streets of a city, or a town, or a turnpike road, or a public market, or a postoffice, or his right to sit in a public building with others, of whatever race, for the purpose of hearing the political questions of the day discussed. Scarcely a day passes without our seeing in this court room citizens of the white and black races sitting side by side, watching the *263 progress of our business. It would never occur to any one that the presence of a colored citizen in a court house, or court room, was an invasion of the social rights of white persons who may frequent such places. And yet, such a suggestion would be quite as sound in law—I say it with all respect—as is the suggestion that the claim of a colored citizen to use, upon the same terms as is permitted to white citizens, the accommodations of public highways, or public inns, or places of public amusement, established under the license of the law, is an invasion of the social rights of the white race.
The Court, in its opinion, reserves the question whether Congress, in the exercise of its power to regulate commerce amongst the several States, might or might not pass a law regulating rights in public conveyances passing from one State to another. I beg to suggest that that precise question was substantially presented here in the only one of these cases relating to railroads: Robinson and wife v. Memphis & Charleston Railroad Company. In that case it appears that Mrs. Robinson, a citizen of Mississippi, purchased a railroad ticket entitling her to be carried from Grand Junction, Tennessee, to Lynchburg, Virginia. Might not the act of 1875, be maintained in that case, as applicable at least to commerce between the States, notwithstanding it does not, upon its face, profess to have been passed in pursuance of the power given to Congress to regulate commerce? Has it ever been held that the judiciary should overturn a statute, because the legislative department did not accurately recite therein the particular provision of the Constitution authorizing its enactment? We have often enforced municipal bonds in aid of railroad subscriptions where they failed to recite the statute authorizing their issue, but recited one which did not sustain their validity.
The inquiry in such cases has been, was there, in any statute, authority for the execution of the bonds? Upon this branch of the case, it may be remarked that the State of Louisiana, in 1869, passed a statute giving to passengers, without regard to race or color, equality of right in the accommodations of railroad and street cars, steamboats or other water crafts, stage coaches, omnibuses, or other vehicles. But in Hall v. De Cuir, 95 U. S., 487, that act was pronounced unconstitutional so far as it related to commerce between the States, this Court saying that “if the public good requires such legislation it must come from Congress and not from the States.” I suggest, that it may become a pertinent inquiry whether Congress may, in the exercise of its power to regulate commerce among the States, enforce among passengers on public conveyances equality of right, without regard to race, color or previous condition of servitude, if it be true-—which I do not admit—that *264 such legislation would be an interference by government with the social rights of the people.
My brethren say, that when a man has emerged from slavery, and by the aid of beneficent legislation has shaken off the inseparable concomitants of that state, there must be some stage in the progress of his elevation when he takes the rank of a mere citizen, and ceases to be the special favorite of the laws, and when his rights as a citizen, or a man, are to be protected in the ordinary modes by which other men’s rights are protected. It is, I submit, scarcely just to say that the colored race has been the special favorite of the laws. What the Nation, through Congress, has sought to accomplish in reference to that race is—what had already been done in every State in the Union for the white race, to secure and protect rights belonging to them as freemen and citizens, nothing more. The one underlying purpose of Congressional legislation has been to enable the black race to take the rank of mere citizens. The difficulty has been to compel a recognition of their legal right to take that rank, and to secure the enjoyment of privileges belonging, under the law, to them as a component part of the people for whose welfare and happiness government is ordained. At every step, in this direction, the Nation has been confronted with class tyranny, which a contemporary English historian says is, of all tyrannies, the most intolerable, “ for it is ubiquitous in its operation, and weighs, perhaps, most heavily on those whose obscurity or distance would withdraw them from the notice of a single despot.”
To-day, it is the colored race which is denied, by corporations and individuals, wielding public authority, rights fundamental in their freedom and citizenship. At some future time it may be some other race that will fall under the ban. If the constitutional amendments be enforced, according to the intent with which, as I conceive, they were adopted, there cannot be, in this Republic, any class of human beings in practical subjection to another class, with power in the latter to dole out to the former just such privileges as they may choose to grant. The supreme law of the land has decreed that no authority shall be exercised in this country upon the basis of discrimination, in respect of civil rights, against freemen and citizens because of their race, color, or previous condition of servitude. To that decree—for the due enforcement of which, by appropriate legislation, Congress has been invested with express power—every one must bow, whatever may have been, or whatever now are, his individual views as to the wisdom or policy, either of the recent changes in the fundamental law, or of the legislation which has been enacted to give them effect.
For the reasons stated I feel constrained to withhold my assent to the opinion of the Court.