TOWNSHIP OF PINE GROVE v. TALCOTT.

1. There is nothing in the constitution of Michigan (established A.D. 1850, and which ordains among other things that—

"No person shall be deprived of property without due process of law. The credit of the State shall not be granted in aid of any person, association, or corporation. The State shall not be a party to or interested in any work of internal improvement")

which makes void the act of the legislature of that State passed March 22d, 1869, and by which it was enacted—

"That it shall be lawful for any township or city to pledge its aid to any railroad company now chartered, organized, or that may hereafter be organized under or by virtue of the laws of the State of Michigan, in the construction of its road, by loan or donation, with or without conditions, for such sum or sums, not exceeding 10 per centum of the assessed valuation then last made of the real and personal property in such township or city, as a majority of the electors of such township or city voting shall, at a meeting or meetings to be called for that purpose, determine."

2. The decisions of the highest court of the State to the contrary will not be respected by this court when such decisions are not satisfactory to the minds of the judges here, and when the matter in question is bonds issued in negotiable form by a township of that State, and now in the hands of a citizen of another State or a foreigner, *bonâ fide* and for value paid.

3. Questions relating to bonds issued in a negotiable form, under such an act, involve questions relating to commercial securities; and whether under the constitution of the State such securities are valid or void belongs to the domain of general jurisprudence.

4. *County of Otoe* v. *Railroad Company* (16 Wallace, 667) and *Alcott* v. *The Supervisors* (Id. 678) affirmed.

ERROR to the Circuit Court for the Western District of Michigan, in which court Talcott brought *assumpsit* against the township of Pine Grove, one of the municipalities of the State of Michigan, to recover the amount of certain bonds issued by that township to aid in the construction of a railroad running through the said township, from Kalamazoo to South Haven, both places being in Michigan.

The constitution of Michigan (adopted A.D. 1850) thus ordains:

"ARTICLE VI, § 32. No person shall be compelled in any

criminal case to be a witness against himself, *nor be deprived of life, liberty, or property, without due process of law.*

"ARTICLE XIV, § 6. The credit of the State shall not be granted to or in aid of any person, association, or corporation.

"§ 8. The State shall not subscribe to or be interested in the stock of any company, association, or corporation.

"§ 9. The State shall not be a party to or interested in any work of internal improvement, nor engage in carrying on any such work, except in the expenditure of grants to the State of land or other property.

"§ 11. The legislature shall provide a uniform rule of taxation, except as to property paying specific taxes. Taxes shall be levied upon such property as shall be prescribed by law.

"ARTICLE XV, § 13. The legislature shall provide for the incorporation and organization of cities and villages, and shall restrict their powers of taxation, borrowing money, contracting debts, and loaning their credit.

"ARTICLE XVIII, § 2. When private property is taken for the use or benefit of the public, the necessity for using such property and the just compensation to be made therefor (except when to be made by the State) shall be ascertained by a jury of twelve freeholders, residing in the vicinity of such property, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law.

"§ 14. The property of no person shall be taken for public use without just compensation therefor. Private roads may be opened in the manner to be prescribed by law; but in every case the necessities of the road and the amount of all damage to be sustained by the opening thereof shall be first determined by a jury of freeholders," &c.

These provisions of the constitution being in force, the legislature of Michigan, on the 22d of March, 1869, passed an act entitled "An act to enable any township, city, or village to pledge its aid, by loan or donation, to any railroad company now chartered or organized under and by virtue of the laws of the State of Michigan, in the construction of its road."

The act enacted:

"That it shall be lawful for any township or city to pledge its aid to any railroad company now chartered, organized, or that

may hereafter be organized, under and by virtue of the laws of the State of Michigan, in the construction of its road, by loan or donation, with or without conditions, for such sum or sums, not exceeding ten per centum of the assessed valuation then last made of the real and personal property in such township or city, as a majority of the electors of such township or city voting shall, at a meeting or meetings called for that purpose, determine."

The manner in which the vote should be taken and the bonds executed was provided for in subsequent sections.

Under this act the bonds on which the suit was brought were issued. The bonds, and the coupons attached to them, were made " payable to bearer." It was not denied that the directions given in the act were carried out.

The declaration set forth in special counts the cause of action. The township demurred on the sole ground that the law in question was in conflict with the constitution of the State, and judgment being given against the township, it brought the case here.

The act under which the bonds were issued had been the subject of very full consideration by the Supreme Court of Michigan, in *Bay City* v. *The State Treasurer*,* and an act of a similar character had been previously considered by the same court in *The People* v. *Salem*.† Both acts were declared to be in conflict with the constitution, and void.

In the former case (Graves, J., dissenting, and delivering an opinion in dissent), the unconstitutionality of the law was placed upon several distinct grounds, some of which were more fully insisted on than others.

In the latter case it was held (Cooley, J., delivering on this occasion, as he had done on the former, the opinion of the court), that the statute was in conflict with Article VI, section thirty-two, already quoted, which provides that no person shall be deprived of his property without due process of law, and also with the provisions of Article XIV, sections eight and nine, also already quoted, which prohibit the

* 23 Michigan, 499, 504.       † 20 Id. 452.

State from being a party to or interested in any works of internal improvement.

The court observes that the State had, prior to 1850, when the constitution was established, been engaged in works of the description named and had owned some of the principal railroads in the State. It refers to the history of the times in which the constitution was adopted, and points out how previously to that time the people had been fraudulently led into the creation of debts for railroads of which they denied the moral obligation, and in consequence of which their public credit had been impaired; and how—interpreting these provisions as effectually guarding them against the like evils and dangers for the future—the people were induced more than by any other motive to adopt the constitution. The court says:

"All these provisions were incorporated by the people in the constitution as precautions against injudicious action by themselves, if in another time of inflation and excitement they should be tempted to incur the like burdensome taxation in order to accomplish public improvement in cases where they were not content to wait the result of private enterprise. The people meant to erect such effectual barriers that if the temptation should return, the means of inflicting the like injury upon the credit, reputation, and prosperity of the State should not be within the reach of the authorities. They believed these clauses of the constitution accomplished this purpose perfectly; and none of its provisions had more influence in recommending that instrument to the hearty good-will of the people.

"In process of time, however, a majority in the legislature were found willing, against the solemn warning of the executive, to resort again to the power of taxation in aid of internal improvement. It was discovered that though 'the State' was expressly inhibited from giving such aid in any form, except in the disposition of grants made to it, the subdivisions of which the State was composed were not under the like ban. Decisions in other States were found which were supposed to sanction the doctrine that under such circumstances, the State might do indirectly through its subdivisions what directly it was forbidden to do. This way was opened by which the whole purpose of

the constitutional provisions quoted might be defeated. The State could not aid a private corporation with its credit, but it might require each of its townships, cities, and villages to do so. The State could not load down its people with taxes for the construction of a public improvement, but it might compel the municipal authorities, which were its mere creatures, and which held their whole authority and their whole life at its will, to enforce such taxes, one by one, until the whole people were bent to the burden.

"Now, whatever might be the just and proper construction of similar provisions in the constitutions of States whose history has not been the same with our own, the majority of this court thought, when the previous case was before us, and they still think, that these provisions in our constitution do preclude the State from loaning the public credit to private corporations, and from imposing taxation upon its citizens, or any portion thereof, in aid of the construction of railroads. So the people supposed when the constitution was adopted. Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberate action; and it cannot be permissible to the courts that, in order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was, to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power. In these cases we thought we could arrive at it from the public history of the times."

Notwithstanding these decisions, the court below gave judgment against the township, and it, accordingly, brought the case here.

*Mr. J. A. Garfield, for the plaintiff in error :*

The only point in issue below was the meaning of the constitution of the State, and on such a question it was the duty of the court below to have taken as true the meaning

put upon it by its highest judicial tribunal. If a contrary course of proceeding is permissible there is an end to the independence of the judiciary of the States, and the decisions of tribunals which are confessedly constitutional expositors of the local law, are reviewed and reversed by a tribunal possessing no authority to exercise such functions upon any theory of State and Federal jurisdiction hitherto recognized in our judicial history.

A long series of decisions in this court—of which *Nesmith* v. *Sheldon*\* is but one illustration of which there are infinite other ones from the first page of Dallas to the last of Wallace—stand out to witness that the Federal tribunals have ever recognized and felt bound by the decisions of the State courts in matters of local law. Although pressed on many occasions to " amplify the jurisdiction," the rule has been steadily adhered to, unless the case was within some of the recognized exceptions. This case falls within none of the exceptions. Nor is it in that class of cases where it has been held that " if a contract when made was valid under the laws and constitution of a State as they had been previously expounded by its judicial tribunals, and as they were understood at the time, no subsequent action by the legislature or the judiciary will be regarded by this court as establishing its invalidity." Neither the act under consideration nor any like act had ever been held valid. No exposition had ever been made of the constitution of 1850, from which it could be concluded that such legislation would be sustained. There was no previous course of decision which held even by inference that the constitutional prohibitions above referred to would authorize municipal taxation in aid of works of internal improvement.

The case of *Swan* v. *Williams*,† which might, at a hasty view, be taken as disproving what we say, was not a case arising under the present constitution. Indeed, it was a case which originated when an entirely different public policy prevailed, and under a constitution which permitted

---

\* 7 Howard, 812.                    † 2 Michigan, 427.

the legislature to make the public a party to such enterprises. What that case decides was this only, that a railroad was so far of public use as to justify the exercise of the power of eminent domain by allowing it to take private property upon payment of compensation.

Independently of all constitutional restraints, the bonds are void. The railroad was a private enterprise. It had no element of a public object, otherwise than as all manufactures, canals, steamboat lines, and other things open to persons generally to enjoy on payment of their money, are to be called public.

The present case, therefore, is that of a person buying bonds and running the risk of their being held valid.

*Messrs. J. S. Black and C. A. Kent, with whom were Messrs. C. I. Walker and D. D. Hughes, contra.*

Mr. Justice SWAYNE recapitulated the facts of the case, and delivered the opinion of the court.

The facts of the case are few and undisputed, and the legal question presented has been settled by this court.

On the 22d of March, 1869, the legislature of Michigan passed an act entitled "An act to enable any township, city, or village to pledge its aid, by loan or donation, to any railroad company now chartered or organized under and by virtue of the laws of the State of Michigan, in the construction of its road."

The plaintiff in error was the defendant in the court below. It is a body corporate in the county of Van Buren, in Michigan. The case made by the declaration is as follows:

The Kalamazoo and South Haven Railroad Company is a corporation organized under the laws of Michigan, having for its object the construction of a railroad from the village of Kalamazoo to the village of South Haven, in that State. The line of its proposed route passed through the township of Pine Grove. Pursuant to the act of the legislature before mentioned, a meeting of the electors of the township was called to vote upon the proposition whether the town-

ship should, in aid of the construction of the road, give to the company its coupon bonds to the amount of $12,000, bearing interest at the rate of ten per cent. per annum, one-sixth of the principal to be payable at the end of each succeeding year, from March 1st, 1870, until the whole amount was paid; the interest to be payable annually from that time. A majority voted for the proposition, and the bonds were issued. They bore date June 1st, 1869. The plaintiff, Talcott, was the holder and owner of a part of the bonds and coupons. They are described in the declaration, and were overdue. The township filed a demurrer. It was overruled by the court; and the township electing to stand by it, judgment was given for the plaintiff. The township thereupon sued out this writ of error, and has thus brought the case before this court for review.

It is not alleged that the bonds were not issued in conformity to the act, nor that there has been any want of good faith on the part of the railroad company, nor that the plaintiff, Talcott, was not a *bonâ fide* holder. But it has been argued that the act of the legislature was void. This presents the only question in the case, and it is fundamental. If the foundation fails the entire superstructure reared upon it must fall. It is said the act is in conflict with the constitution of the State.

It is an axiom in American jurisprudence that a statute is not to be pronounced void upon this ground, unless the repugnancy to the constitution be clear, and the conclusion that it exists inevitable. Every doubt is to be resolved in support of the enactment. The particular clause of the constitution must be specified and the act admit of no reasonable construction in harmony with its meaning. The judicial function involving such a result is one of delicacy, and to be exercised always with caution.* It must be admitted that the constitution here in question contains nothing directly adverse upon the subject. But we have been referred in

* Twitchell *v.* Blodgett, 13 Michigan, 127; Tyler *v.* The People, 8 Id. 320; People *v.* Mahany, 13 Id. 482.

this connection to the following provisions: The thirty-second section of Article VI declares that "no person, in any *criminal case*, shall be compelled to be a witness against himself, *or be deprived of life, liberty, or property without due process of law.*" Here there is no imputation of crime. The clause is confined to judicial proceedings. Article XIV, clauses six, eight, and nine, provide that the credit of the State shall not be granted to, or in aid of, any person, association, or corporation; that the State shall not be interested in the stock of any corporation, and that the State shall not subscribe to, or be interested in, any work of internal improvement, or engage in carrying on any such work, except in the expenditure of grants to the State of land or other property. In this case it is the township and not the State that is concerned. The State has done nothing, and is in nowise liable.

The present constitution was adopted in the year 1850. Before that time numerous acts involving the same principle with the one here in question had been passed by seventeen States. Congress, by the act of June 3d, 1856,* granted a large quantity of land to Michigan, to be used in aid of the construction of railroads. This land was appropriated by the State to several different companies, pursuant to the provisions of the act. Other companies were subsequently aided in the same way. In 1863 began a series of special legislative acts authorizing the municipal subdivisions of the State named therein to give their aid respectively to the extent and in the manner prescribed. Between that time and the year 1869 thirty such statutes were enacted. In the latter year the general law was passed under which the bonds in question were issued. This summary shows the understanding in the legislature, and out of it, in the State, that there was no constitutional prohibition against such legislation. It does not appear that its validity was ever in any instance judicially denied until the year 1870.

The case as to the constitution is a proper one for the ap-

---

* 11 Stat. at Large, 21.

plication of the maxim, *Expressio unius est exclusio alterius.* The instrument is drawn with ability, care, and fulness of details.  If those who framed it had intended to forbid the granting of such aid by the municipal corporations of the State, as well as by the State itself, it cannot be that they would not have explicitly said so.  It is not to be supposed that such a gap was left in their work from oversight or inadvertence.

The eleventh clause of the same article declares that the legislature shall provide a uniform rule of taxation, except as to property paying specific taxes, and that taxes shall be levied upon such property as shall be prescribed by law. The object of this provision was to prevent unjust discriminations.  It prevents property from being classified and taxed as classed, by different rules.  All kinds of property must be taxed uniformly, or be entirely exempt.  The uniformity must be coextensive with the territory to which the tax applies.  If a State tax, it must be uniform all over the State.  If a county or city tax, it must be uniform throughout such county or city.*  But the rule does not require that taxes for the same purposes shall be imposed in different territorial subdivisions at the same time.  If so a county could not levy a tax to build a court-house, jail, or infirmary without rendering it necessary for every other county in the State to do the same thing without reference to the different circumstances of each one.  So here one township through which the railroad was to pass, expecting to be largely benefited by its construction, might give its bonds and impose the tax requisite to meet the principal and interest, while another township similarly situated might refuse to do so. The rule would have no application to the latter.

The second and fourteenth clauses of Article XVIII prescribe that when private property is taken for public use just compensation shall be made to the owner.  These provisions relate to the exercise of the right of eminent domain.

The thirteenth clause of Article XV declares that " the

---

* Gilman *v.* The City of Sheboygan, 2 Black, 514.

legislature shall provide for the incorporation and organization of cities and villages, and shall restrict their powers of taxation, borrowing money, contracting debts, and loaning their credit." The power here in question was exercised by a township. The language of this clause clearly implies that the powers to be restricted may be exercised; and what is implied is as effectual as what is expressed.* Congress can pass no laws but such as the Federal Constitution expressly, or by necessary intendment, permits.

The legislative power of a State extends to everything within the sphere of such power, except as it is restricted by the Federal Constitution or that of the State. In the present case we have found nothing that in our judgment warrants the conclusion that the act in question is wanting in validity by reason of its unconstitutionality.

But it has been argued that aside from any constitutional prohibition the legislature had no power to authorize the imposition of a tax for any other than a public purpose, and that this act is not within that rule. Conceding for the purposes of this opinion the soundness of the first proposition, the second can by no means be admitted.

Though the corporation was private, its work was public, as much so as if it were to be constructed by the State. Private property can be taken for a public purpose only, and not for private gain or benefit. Upon no other ground than that the purpose is public can the exercise of the power of eminent domain in behalf of such corporations be supported. This view of the subject has been taken by the Supreme Court of Michigan.† But upon other grounds, we think the public character of such works cannot be doubted. Where they go they animate the sources of prosperity, and minister to the growth of the cities and towns within the sphere of their influence. Unless prohibited from doing so a municipal corporation has the same power to aid in their construction as to procure water for its water-works, coal

---

* United States v. Babbit, 1 Black, 61.
† Swan v. Williams, 2 Michigan, 427.

for its gas-works, or gravel for its streets from beyond its territorial limits.* Under the limited powers conferred by the Federal Constitution, Congress has frequently given aid in such cases. The Pacific railroads and the Louisville canal furnish instances of such action by that body. The gift to the sufferers from the overflow of the Mississippi, and prior acts of the kind, must also be borne in mind. Cannot a State legislature do the same things?

It does not belong to courts to interpolate constitutional restrictions. Our duty is to apply the law, not to make it. All power may be abused where no safeguards are provided. The remedy in such cases lies with the people, and not with the judiciary.

We pass by without remark the point whether in cases like this the public or private character of the work is not a legislative rather than a judicial question.

It is insisted that the invalidity of the statute has been determined by two judgments of the Supreme Court of Michigan,† and that we are bound to follow those adjudications. We have examined those cases with care. With all respect for the eminent tribunal by which the judgments were pronounced, we must be permitted to say that they are not satisfactory to our minds. We think the dissenting opinion in the one first decided is unanswered. Similar laws have been passed in twenty-one States. In all of them but two, it is believed their validity has been sustained by the highest local courts. It is not easy to resist the force of such a current of reason and authority. The question before us belongs to the domain of general jurisprudence. In this class of cases this court is not bound by the judgment of the courts of the States where the cases arise. It must hear and determine for itself. Here, commercial securities are involved. When the bonds were issued, there had been no authoritative intimation from any quarter that such statutes were invalid. The legislature affirmed their validity in

---

* Meyer *v.* Muscatine, 1 Wallace, 389.

† The People *v.* Salem, 20 Michigan, 452; Bay City *v.* The State Treasurer, 23 Id. 499.

every act by an implication equivalent in effect to an express declaration. And during the period covered by their enactment, neither of the other departments of the government of the State lifted its voice against them. The acquiescence was universal.*

The general understanding of the legal profession throughout the country is believed to have been that they were valid. The National Constitution forbids the States to pass laws impairing the obligation of contracts. In cases properly brought before us that end can be accomplished unwarrantably no more by judicial decisions than by legislation. Were we to yield in cases like this to the authority of the decisions of the courts of the respective States, we should abdicate the performance of one of the most important duties with which this tribunal is charged and disappoint the wise and salutary policy of the framers of the Constitution in providing for the creation of an independent Federal judiciary. The exercise of our appellate jurisdiction would be but a solemn mockery.†

The question here under consideration was fully considered by this court in *Railroad Company* v. *County of Otoe*,‡ and in *Olcott* v. *The Supervisors*.§ We have no disposition to qualify anything said in those cases. They are conclusive in the case before us.

In Sedgwick on Statutory and Constitutional Law,‖ it is said: "It must be further borne in mind that the invalidity of contracts made in violation of statutes is subject to the equitable exception, that although a corporation in making a contract acts in disagreement with its charter, where it is a simple question of capacity or authority to contract arising either on a question of regularity of organization or of power conferred by the charter, a party who has had the benefit of the agreement cannot be permitted in an action founded on it to question its validity. It would be in the highest degree inequitable and unjust to permit the defendant to repudiate

---

\* Gelpcke v. Dubuque, 1 Wallace, 175.

† Butz v. Muscatine, 8 Wallace, 579.                    ‡ 16 Id. 667.

§ Ib. 678.                                              ‖ Page 90.

a contract the fruits of which he retains.   And the principle of this exception has been extended to other cases.   So a person who has borrowed money of a savings institution upon his promissory note, secured by a pledge of bank stock, is not entitled to an injunction to prevent the prosecution of the note upon the ground that the savings bank was prohibited by its charter from making loans of that description." The authorities referred to sustain the text.*   But it is not necessary to place our judgment upon this ground.   We rest it upon the other views which have been expressed, and the authority of our own preceding adjudications.

JUDGMENT AFFIRMED.

The CHIEF JUSTICE did not sit in this case, and took no part in its decision.

Justices MILLER and DAVIS dissented.

---

* Palmer *v.* Lawrence, 3 Sandford's S. C. 162; Steam Navigation Co. *v.* Weed, 17 Barbour, 378; Chester Glass Co. *v.* Dewey, 16 Massachusetts, 94; Steamboat Co. *v.* McCutcheon, 13 Pennsylvania State, 13; Potter *v.* The Bank of Ithaca, 5 Hill, 490; Suydam *v.* Morris Canal and Banking Co., Ib. 491; Sacket's Harbor Bank *v.* Lewis County Bank, 11 Barbour, 213; Mott *v.* United States Trust Co., 19 Id. 568.