177 P.2d 174

**FLASKA, County Assessor, v. STATE et al.**

**No. 4959.**

Supreme Court of New Mexico.

Dec. 5, 1946.

Rehearing Denied Dec. 31, 1946.
Second Rehearing Denied Feb. 19, 1947.

C. C. McCulloh, Atty. Gen., Robert W. Ward and William R. Federici, Asst. Attys.

Gen., and E. P. Ripley, Special Tax Attorney for State Tax Commission, of Santa Fe, for appellants.

M. A. Threet, of Albuquerque, for appellee.

CHARLES H. FOWLER, District Judge.

Flaska, the Bernalillo County Assessor, sued for a declaratory judgment to advise whether the New Mexico statute commonly called the "Soldier's Tax Exemption Law" (Chapter 130, Laws of 1923, as amended, now Sections 76-111 to 76-117, NMSA 1941) authorizes allowance of the tax exemption to soldiers whose period of service was during World War II. (For brevity the term "soldier" is used to designate any person who is or may be eligible to have the exemption under the statute.)

The issues were made up by the pleadings to call for determination of the question.

The trial court held that the Soldier's Tax Exemption Law as written is not applicable to soldiers of World War II. This holding followed upon the court's conclusion that the New Mexico Constitution does not authorize the legislature to grant the tax exemption to a soldier whose period of military service was during any war occurring subsequent to the adoption of the Amendment which is now Article 8, Section 5, of the Constitution. Since that section contains the only grant of power to the legislature to provide for the exemption, it follows that if its provisions relate only to soldiers whose pertinent period of service was in some war prior to the adoption of the Amendment, all statutes passed in the exercise of such power must also be limited to relate to such soldiers of prior wars.

Judgment was rendered in accordance with the court's decision and this appeal was taken by the defendants.

The primary question for decision is: Does the New Mexico Constitution, Article 8, Section 5, authorize the legislature to grant the tax exemption to soldiers of World War II?

If that question be answered here in the negative, the matter is concluded. If that question be answered here in the affirmative, then answer will be required to the further question: Does the Soldier's Tax Exemption Law as written grant the exemption to soldiers of World War II?

Article 8, Section 5, of the Constitution reads:

"The legislature may exempt from taxation property of each head of a family to the amount of two hundred dollars, and the property of every honorably discharged soldier, sailor, marine and army nurse, and the widow of every such soldier, sailor, or marine, who served in the armed forces

of the United States at any time during the period in which the United States was regularly and officially engaged in any war, in the sum of two thousand dollars. Provided, that in every case where exemption is claimed on the ground of the claimants having served with the military or naval forces of the United States as aforesaid, the burden of proving actual and bona fide ownership of such property, upon which exemption is claimed, shall be upon the claimant."

The section was proposed as a constitutional amendment by joint resolution of the legislature, approved March 11, 1921, and was adopted by the people at a special election held September 20, 1921. World War I was ended officially by Congressional resolution and Presidential proclamation on July 2, 1921. World War II is the only war in which the United States has been regularly and officially engaged since the Amendment was adopted and became part of the Constitution.

The trial court noted that the Amendment, as it relates to soldiers, uses only the past tense. The court held that the provision authorizes the legislature to grant the tax exemption to soldiers of World War I and prior wars, but does not authorize such a grant to soldiers of any war subsequent to the time of the adoption of the Amendment. In other words, the holding was that Section 5 related and re-lates only to those soldiers whose eligibility for the exemption was established, or made possible, already through having served in the armed forces of the United States during a period in which the nation had been regularly and officially engaged in some war which was fought before the adoption of the Constitutional Amendment. It may be noted that in the statute, as in the constitutional provision, only the past tense and the same verb forms are used.

The appellee presses the argument here. In addition to his claim that the language used is plain and shows the certain intent, he declares that the history of the Amendment shows that in adopting it the people had in mind the first World War, then just concluded, and that they limited the authority conferred upon the legislature to permission to grant the exemption to soldiers of that and prior wars. Of this he says:

"The first World War was over. People all over the world, the United States, and New Mexico were rejoicing that the War to end wars was ended. The people of New Mexico, out of a grateful heart, in order to show their appreciation for the sacrifices made by their sons and daughters, expressed their wants, intention and designs in adopting the Amendment to the Constitution granting tax exemptions to those who had participated in that great

conflict, and to the dependents of those who did not return. The intention, want and design of the people of the State of New Mexico, in adopting the Amendment to the Constitution, was to reward, in a measure, those who had fought the last of all wars. This was what they had in mind. They could not foresee that another great conflict was imminent. They were thinking of the present and the past, with no thought of the future. * * * They, the people, desired to reward the soldiers who had rendered services in the defense of their country in past wars, as all pertinent language of the amendment restricted its application to wars fought prior to its adoption. The intent of the people was to leave to the future the adjustment of other situations when they should arise. No one contemplated another war, and no provision was made for the soldiers of that war."

Thus is the contention of the appellee, Flaska, plainly set out. Is his conclusion correct concerning the will of the people in adopting the Amendment? If indeed the will of the people was as stated by the appellee, then the constitutional provision does restrict the legislature and the judgment of the trial court was correct.

 It is the duty of this court to search out and declare the true meaning and intent of the Amendment as adopted by the people.

"Terms used in a Constitution must be taken to mean what they meant to the minds of the voters of the state when the provision was adopted." Tintic Standard Mining Co. v. Utah County, 80 Utah 491, 15 P.2d 633, 637.

"Constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action, and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written Constitution not warranted by the intention of its founders." 11 Am.Jur. 659, Sec. 50, Constitutional Law.

 If the language used in the provision in question is plain and definite and free from ambiguity, when taken in its plain and ordinary sense, there is no occasion for construction of it. If the meaning of the language is not clear and precise, that is if more than one fair and reasonable interpretation can be put upon the language employed, then the history of the Amendment and the conditions which prompted its framing and adoption may be considered to shed light on the terms used and to ascertain truly "the will of the people therein recorded."

By the Amendment the legislature ever since 1921 has been, and today is, authorized to exempt from taxation, to the

amount of $2000, the property of *"every honorably discharged* soldier * * * who *served* * * * at any time during the period in which the United States *was* regularly and officially *engaged* in *any* war."

By a statute passed in 1923 the legislature undertook to allow such tax exemption to *"every honorably discharged* soldier * * * resident of New Mexico and who *served* * * * for thirty [30] days or more at any time in which the United States was officially *engaged* in *any* war." § 76-111. By amendment in 1933 it was provided that the claimant's residence must be acquired prior to January 1, 1934.

Prompting the bringing of this suit, this situation faces the County Assessor: Two men stand before him, each demanding allowance of the tax exemption. Each of them is an honorably discharged soldier, a resident of New Mexico since a time prior to January 1, 1934, who served in the armed forces of the United States for more than thirty days at a time in which the United States was regularly and officially engaged in war. One of these claimants is a "soldier" who served with the United States Army in France during World War I; the other of them is a "soldier" who served with the United States Army in France during World War II. Does the language of the Amendment, now Article 8, Section 5, of the Constitution, permit the allowance of the tax exemption to the first

of these men, and *require* it to be withheld from the second of them? The service of both men is in the past, and must be spoken of in the past tense. No words can describe more fitly the status of these men in regard to their army service than the language of the Amendment, with its past tense; each honorably *discharged,* his army term *served* during a time in which the United States *was engaged* in war. Should the misfortune of war again involve us, this same language of the Amendment will fitly describe the veteran of that third World War at the hour when, with honorable discharge in hand, he shall ask that the exemption be allowed to him, for he will be then a soldier, honorably *discharged,* who *served* at a time when the United States *was engaged* in a war.

Allowing then that the terms used conceivably might bear more than one construction, let us consider the history of the provision and the conditions under which it was adopted together with the words used to express "the will of the people."

None may doubt that it was the immediacy of the first World War and the surge of emotions it evoked which moved the people to frame and adopt the Amendment. In this way, in some measure of reward, did the people express their gratitude to war veterans for heroic services rendered. The soldiers, sailors and marines of World War I, the youth of that generation, who were

the sons and brothers and husbands of those who adopted the Amendment, were the ones whose service and sacrifice stirred the feelings of the people to set in motion the machinery which resulted in the resolution and exemption. But when the provision was drawn up it was not restricted to the soldiers, sailors and marines of that war. It was made to apply to those of "any" war. Deliberately the people extended the bounty to veterans of the Spanish-American, Civil and Mexican, and "any" wars in which the United States "was engaged."

Had it been the desire and intent of the people to restrict the application of the provision to soldiers of wars then in the past, that meaning could have been made clear by use of language incapable of any other interpretation. Instead, the people chose language which now perfectly describes the soldier of World War II. A moment's reflection on the part of any legislator who framed or supported the resolution, or of any voter who voted to adopt it as part of the Constitution, in 1921, would have made him fully aware that an interpretation rendering the exemption allowable to soldiers of wars then in the future *not only* reasonably *could be, but* indeed *would have to be,* placed upon the language used in the Amendment, *unless* the very argument made here by appellee should prevail against it—namely, that the people of that day looked only to the past and were indifferent to and regardless of and unconcerned for making the provision for any soldiers of wars thereafter to come, and that they did not intend to do so. With such meaning implicit in the language used, unless such argument were brought forward and sustained, can we say that the people who adopted the Amendment as part of the State's fundamental law did not intend that meaning? Can we say that on the contrary the people willed and intended that the provision should not govern the future but should be and was confined to meet existing conditions of that day and limited in application to a class whose membership was then already fully made up?

"It is presumed that the people expressed themselves in careful and measured terms in framing the constitution and that they left as little as possible to implication." 16 C.J.S., Constitutional Law, § 14, page 50; Vaughn & Ragsdale Co. v. State Board of Equalization, 109 Mont. 52, 96 P.2d 420.

In careful and measured terms the people and framers of the Amendment extended the privilege of the exemption to every honorably discharged soldier of any war. This gave it to soldiers of wars fought long before the first World War. If the provision does not extend to later wars, it must be because the people by their implied intention excluded them, for we now see that the "careful and measured terms" used do perfectly describe and picture the honor-

ably discharged soldier of the present great World War.

Nothing has been presented to show what debates or arguments or explanations, if any, were offered among the framers of the resolution or among and to the people who adopted the Amendment, as to its meaning and intent with reference to being limited to soldiers of then past wars. If such matters could be considered, we are left without information concerning them.

Considering the fitness of the language used to describe today the soldiers of our most recent war, it seems plain that if the people who adopted the Amendment actually did intend to restrict its application to wars fought prior to its adoption, it was indeed because "they were thinking of the present and the past, with no thought of the future" and they meant "to leave to the future the adjustment of other situations when they should arise," as the appellee contends. Therefore, we may look to the conditions existing in that day.

We must assume that the people, in 1921, were enlightened and in general informed of world events. Among the world events then of common knowledge and arresting the attention of men were these: "That China was in a state of declared war; there was revolution and siege in Bolivia; our neighbor republic, Mexico, was virtually in civil war; in Morocco its tribes-men and Spanish soldiers were at war, and in a single battle in July ten thousand soldiers died; South Arabia was in war; Italy was in revolt and its government was in process of change by violence; Ireland was in turmoil and "a guerrilla war of the bitterest intensity was (being) fought in all counties;" Russia was still in revolution; Greece and Turkey were again at each other's throats in war, and in early September, only days before the amendment election, the city of Smyrna died by battle and war-set fire, with loss of thousands of lives and millions of dollars in property; that the Senate of the United States after bitter debate had rejected the proposed adherence of this nation to the League of Nations (which many people then regarded as the World's last hope for lasting peace) and Senators had declared that the provisions of its Covenant, if accepted, would "make America the policeman of the world," and would "embroil us in foreign wars," and that its voting plan would enable a small group of foreign powers, Japan among them, against our will and consent to "vote us into war;" that the naval armament race between the Great Powers was in full swing and had reached to proportions so alarming that the nations had arranged the Washington Conference to discuss means to curb that race —but that Conference was still in the future when the Amendment was adopted. The people saw in the world about them

that the War to end wars had not brought World Peace. They knew that this Nation had never experienced peace, free from "regular and official" war, for as long as thirty-four consecutive years.

Another condition, which may have prompted the people's action, was the fact that while other states had paid bonuses, or had granted tax exemptions, or had given other material assistance to soldiers of the first World War, New Mexico had not done so. With choice of method by which to remedy this condition open to them the legislature, by framing the Constitutional Amendment, and the people, by adopting it, turned away from the bonus plan or similar measures and chose the tax exemption plan instead as a means of rewarding New Mexico's soldier sons. The bonus plan would have been applicable only to soldiers of the first World War or prior wars. The tax exemption plan could be made applicable to the veterans of *any* wars, whether past or in progress or of the future.

■ It must be presumed that the people know the meaning of the words they use in constitutional provisions, and that they use them according to their plain, natural and usual signification and import, and with due regard to the fact that they are framing a part of the permanent and fundamental law of the state, and with understanding of the general rules of construction as to provisions of Constitutions.

"A Constitution, unlike a statute, is intended not merely to meet existing conditions, but to govern the future. It has been said that the term 'constitution' implies an instrument of a permanent nature. * * * As a rule a Constitution does not deal in details, but enunciates the general principles and general directions which are intended to apply to all new facts that may come into being, and which may be brought within these general principles or directions." 6 R.C.L. 16, Sec. 3, Constitutional Law; 11 Am.Jur. 604.

"The language of a Constitution is not to be limited to the precise things considered therein, but it embraces other things as they come into being of the same general nature or class." Sturtevant Co. v. O'Brien, 186 Wis. 10, 202 N.W. 324, 327.

"Although the meaning or principles of a constitution remain fixed and unchanged from the time of its adoption, a constitution must be construed as if intended to stand for a great length of time, and it is progressive and not static. Accordingly, it should not receive too narrow or literal an interpretation, but rather the meaning given it should be applied in such a manner as to meet new or changed conditions as they arise." 16 C.J.S., Constitutional Law, § 14, at page 49. See 11 Am.Jur. 660.

"A Constitution is an instrument of a practical nature, made and adopted by the people themselves, adapted to common

wants and designed for common use. When words are used therein which have both a restricted and general meaning, the general must prevail over the restricted unless the nature of the subject-matter of the context clearly indicates that the limited sense was intended. (Citing authorities.) External aids and arbitrary rules applied to instruments of this popular character are of uncertain value and should be made use of with hesitation and circumspection. (Citing authority.) * * *. The language of a Constitution (or statute) is generally extended to include new things and new conditions of the same class as those specified which were not known or contemplated when it was adopted. (Citing authorities.)" Gaiser v. Buck, 203 Ind. 9, 179 N.E. 1, 3, 82 A.L.R. 1348.

With knowledge of these principles and of world events, the legislature and the people deliberately adopted, in 1921, a plan of reward to our soldiers: (a) Which could be made to apply to soldiers of any war, past or future; although they might have adopted a plan which could have been applicable to soldiers of past wars only; (b) by a provision framed in language which the people knew *could* apply to soldiers of future wars, although by using apt terms therein the people could have made the provision impossible of application to soldiers of any war subsequent to the adoption date; (c) by a provision framed in language which the people well knew *would* describe and apply to the soldiers of later wars, in case any should occur, *unless*, by a construction founded entirely upon consideration of the circumstances surrounding its adoption, the provision should be held to refer only to soldiers of wars previously fought; although by using apt terms therein, one word added would have been enough, the provision could have been restricted and made impossible of misinterpretation or application to soldiers of any later war, if indeed it were the people's intention, meaning and design to exclude them from the Amendment's benefits; (d) by a provision which, on its face, grants a continuing and permanent authority to the legislature, at its discretion and without limitation of time in which to exercise the same, to enact a statute, or statutes from time to time, allowing tax exemption to every honorably discharged soldier of any war in which the United States was engaged when his service was being performed.

The legislature might have delayed indefinitely to exercise the authority. Let us suppose that up to this time the legislature has never taken any action to pass a soldier's exemption law, and that such condition continues until the next legislature meets in January, 1947. And let us suppose that that legislature takes note of this constitutional grant of power, and proceeds to enact a soldier's exemption statute in the identical words of Chapter

130, Laws of 1923. Such legislation would be within and a proper exercise of the authority conferred by the Amendment. No one may doubt that such law on its face would seem to provide the exemption to the soldier of World War II. No one can point out wherein that soldier fails to fit the description and fulfill the definition of "soldier" entitled to the exemption, as expressed in the statute, as completely as does the soldier of any previous war. Yet, if the Amendment has the meaning that appellee contends for here, the statute so passed (as we have assumed) would have to be held to refer only to soldiers of wars fought before September, 1921, and to allow no benefits to soldiers of the second World War.

■■ It is not questioned that taxation is the rule and exemption is the exception; that exemptions are never presumed and the burden is on the claimant to establish clearly his right to the exemption; that the intention to make an exemption must be expressed in clear and unambiguous terms, and that these principles of interpretation apply to statutes and to constitutional provisions. Cooley on Taxation, II, 4th Ed., 1403 et seq. But here we are concerned with an express power granted by the people to the legislature to allow tax exemptions to soldiers of a class defined. Although it relates to exemption, we are not privileged to restrict that power by reading into the provision granting it words that are not there; nor, without proof, may we confine the language used to one narrow channel of meaning, granting a limited power, when a broader meaning, granting a broader power, is implicit in the terms used unless proofs show that the narrower sense was intended. 11 Am.Jur. 668.

■ The language of the Amendment, Article 8, Section 5, is plain, clear and unambiguous. The ambiguity, if it may be so called, does not arise out of the language used, but out of attempt to construe it in the light of the influences and desires which some say brought about the provision's adoption and so to confine its meaning to a part of its whole scope—to restrict it to refer to a group out of a class, although the full sweep of meaning of the language may carry over to and include other groups of the same class. The class is all honorably discharged soldiers who served while the United States was engaged in war. That class may increase in membership as time flows on and wars occur. The group of that class, to which appellee would restrict the meaning of the provision's language, is made up of those soldiers who served while the United States was engaged in war prior to September 20, 1921. The attempt so to confine and interpret the meaning and to restrict the authority for the exemption can succeed only upon a finding that such

meaning and restriction was intended and understood by the people who adopted the provision. Cf. Sanchez v. Contract Trucking Co., 45 N.M. 506, 117 P.2d 815.

Can any one without conjecture say that the voters at the amendment election, in 1921, did not intend the Amendment to apply to future cases and soldiers, if, unhappily, later wars should come? Can any one without conjecture say that those voters overlooked the stern fact of possible future war and actually intended to make no provision for its soldiers in and by the Amendment they adopted? Manifestly, no one can. In framing the provision the people chose expressions that were flexible enough to include veterans of wars then in the future, as well as of wars then in the past, in the class of persons to whom the exemption might be allowed. We must assume that this was intentionally done.

Under the authority conferred by the Amendment the legislature "may exempt" from taxation property of soldiers, etc. But may exempt this when? There is no limit on the time within which that may be done. The soldier to whom the exemption runs must be one who "served" in some war in which the United States "was * * * engaged." But was engaged in such war when? Plainly that period of engagement in war has reference to the time when the soldier's qualifying service was performed. To be eligible for the exemption he must have served during a war; peacetime military service will not suffice. The qualifying service may be in "any" war.

Under the express grant of authority by the Constitution, Article 8, Section 5, the legislature may exempt from taxation, to the amount of $2000, the property of every soldier veteran of any war in which the United States was regularly and officially engaged at the time the soldier served, when from such service, fully performed and as to him necessarily in the past, the soldier stands honorably discharged at the time when he asks that the exemption be allowed to him.

The primary question for decision herein, as above stated, is answered in the affirmative.

Acting under its constitutional authority, the legislature which met next after the adoption of the Amendment passed the Soldier's Tax Exemption Law, Chapter 130, Laws of 1923. In the case of Asplund v. Alarid, 29 N.M. 129, 219 P. 786, the Supreme Court of New Mexico held that act to be constitutional. By Chapter 44, Laws of 1933, the statute was amended by adding a provision that the exemption shall not be allowed to any soldier not a resident of the state prior to January 1, 1934. Another minor change, in deference to draftsmanship, was by changing the year mentioned in the amended section from 1923 to 1933. The statute now appears as Sections

76-111 to 76-117, NMSA1941, but only two sections are of present interest here. They read:

76-111. " 'Soldier' shall mean every honorably discharged soldier, sailor, marine and army nurse resident of New Mexico and who served in the armed forces of the United States for thirty [30] days or more at any time in which the United States was officially engaged in any war, including resident unmarried widows of such soldiers, sailors and marines."

76-113. "Real and personal property of every soldier shall be exempt from taxation in the sum of two thousand dollars [$2,000]. Said exemption shall apply to all taxes levied in the year 1933 and all which may thereafter be levied, but the said exemption shall not apply to any property held in trust by any soldier, except to the extent of the legal beneficial interest of such soldier therein. In addition to said exemption said soldiers are hereby exempted from the payment of road taxes heretofore or hereafter levied. Provided, however, that such exemption from taxation shall not be permitted to be claimed by nor allowed to any soldier who has not, prior to January 1, 1934, acquired residence in the state of New Mexico."

█ In this case the validity of the 1933 amendment, or the statute as amended, has not been attacked, and its validity is assumed. The only question now raised is whether the statute, as written, allows the tax exemption to the soldier of World War II. This is the second question for decision in this case, as above stated. It also must be answered in the affirmative, but with qualification as herein explained due to the residence requirement of the statute.

Upon consideration of the statute, in the light of what has been determined as to the Constitutional Amendment, it is evident that the Soldier's Tax Exemption Law as written allows the tax exemption to every honorably discharged soldier of World War II, and to every honorably discharged soldier of any prior war, who served for thirty days or more in the armed forces of the United States at any time in which the Nation was engaged in such war, and who is a resident of New Mexico and had acquired his residence in this state prior to January 1, 1934.

Perhaps some soldiers who live in and entered military service from New Mexico and served during the present war will be denied benefit of the exemption because of the requirement that residence in the state must have been acquired before 1934 to be eligible for the bounty, unless a change is made in respect of such requirement. If it sees fit to do so, the legislature has authority to act again under, and within the terms of, the constitutional provision herein discussed to meet and provide for conditions which may have grown up since the exemption statute in question was passed.

The District Court erred in rendering its judgment holding that the Soldier's Tax Exemption Law, as written, is not applicable to honorably discharged soldiers of World War II, and that the County Assessor is not authorized to extend the tax exemption to any such soldier, resident of New Mexico and whose residence in this state was acquired prior to January 1, 1934, and who served in the armed forces of the United States for thirty days or more during said war.

The judgment is reversed and the cause is remanded to the District Court with instructions to set aside that judgment and to render new judgment in conformity with the conclusions of this opinion. It is so ordered.

HUDSPETH, J., and A. W. MARSHALL, District Judge, concur.

SADLER, C. J., and BICKLEY, J., having recused themselves, did not participate in this decision.

BRICE, Justice (dissenting).

The constitutional provision in question authorized the state to give annually to a veteran who has taxable property, an indefinite sum of money during his life, though he may never have risked his life in battle; but provides nothing for a poor soldier though he may have earned the Congressional Medal of Honor, or suffered wounds in the defense of his country. We have given to those that have, and have forgotten the needy and poor of our soldiers who "have not." The Federal Government has never discriminated against any of its soldiers by the selection of a favored and least needy class, for its largess. That the State has been defrauded of its taxes by relatives deeding their property to veterans is well known in this state. In a recent argument of a case in this court, it was admitted that a woman living in another state has had the benefit of this tax exemption for years, through holding the title to a valuable lot in Albuquerque in her son's name.

I hasten to say that the fact the law in question is unjust, discriminatory and has been, and is, a source of fraud against the state, does not authorize this court to limit its application upon constitutional grounds beyond the legislative intent. But it does not encourage me to strain the Constitution to the breaking point to include beneficiaries who least need the state's assistance, and who will eventually own a large part of the taxable property of a poor state.

This action was brought by the tax assessor of Bernalillo County against the State of New Mexico and its tax commission, praying for a declaratory judgment on the question of whether the soldiers, sailors, marines and army nurses of the Second World War are entitled to the tax

exemption provided for in the statutes quoted in the majority opinion.

These statutes were enacted in pursuance of Sec. 5 of Art. 8 of the State Constitution as amended in 1921, which is as follows:

"The Legislature may exempt from taxation property of each head of a family to the amount of two hundred dollars, and the property of every honorably discharged soldier, sailor, marine and army nurse, and the widow of every such soldier, sailor, or marine, who served in the armed forces of the United States at any time during the period in which the United States was regularly and officially engaged in any war, in the sum of two thousand dollars. Provided, that in every case where exemption is claimed on the ground of the claimants having served with the military or naval forces of the United States as aforesaid, the burden of proving actual and bona fide ownership of such property, upon which exemption is claimed, shall be upon the claimant."

Section 5 originally read:

"The Legislature may exempt from taxation property of each head of a family to the amount of two hundred dollars."

Regarding liability to taxes and exemptions therefrom, the State Constitution provides:

"Taxes levied upon tangible property shall be in proportion to the value thereof, and taxes shall be equal and uniform upon subjects of taxation of the same class." Art. 8, Sec. 1.

"The property of the United States, the state and all counties, towns, cities and school districts, and other municipal corporations, public libraries, community ditches and all laterals thereof, all church property, all property used for educational or charitable purposes, all cemeteries not used or held for private or corporate profit, and all bonds of the state of New Mexico, and of the counties, municipalities and districts thereof shall be exempt from taxation." Art. 8, Sec. 3.

Regarding these constitutional provisions, we stated in State ex rel. Attorney General v. State Tax Commission, 40 N.M. 299, 58 P.2d 1204, 1206:

"Section 1 of article 8 of the Constitution of New Mexico is as follows: 'Taxes levied upon tangible property shall be in proportion to the value thereof, and taxes shall be equal and uniform upon subjects of taxation of the same class.'

"By the terms of section 3 of article 8, certain specific property is exempt from taxation, and by section 5 thereof the Legislature is authorized to exempt from taxation certain other specific property; and no other property is or can be exempted. The Constitution, in effect, classes tangible property into that exempt from taxa-

tion, that which may be exempted, and that which must be taxed."

And in Sims v. Vosburg, 43 N.M. 255, 91 P.2d 434, 435:

"All tangible property in New Mexico is subject to taxation in proportion to value, and should be taxed, unless specifically exempted by the constitution or by its authority. Secs. 1, 3, and 5 of Article VIII, N.M.Constitution; Albuquerque Alumnae Ass'n v. Tierney, 37 N.M. 156, 20 P.2d 267; State v. State Tax Commission, 40 N.M. 299, 58 P.2d 1204."

I call attention to Sec. 32 of Art. 4 of the State Constitution, which is as follows:

"No obligation or liability of any person, association or corporation, held or owned by or owing to the state, or any municipal corporation therein, shall ever be exchanged, transferred, remitted, released, postponed, or in any way diminished by the legislature, nor shall any such obligation or liability be extinguished except by the payment thereof into the proper treasury, or by proper proceeding in court." Art. 4, Sec. 32.

This court has held that taxes duly assessed and levied are debts owing to the state within the meaning of the last quoted provision of the state's Constitution. State v. Montoya, 32 N.M. 314, 255 P. 634. They have been held by this court to be constitutional insofar as they apply to soldiers, sailors, marines and army nurses of World War One. Asplund v. Alarid, Assessor, etc., 29 N.M. 129, 219 P. 786.

But for the amendment of 1921 (Sec. 5 of Art. 8 N.M.Const. supra) the exemption statutes would have been unconstitutional and therefore void. As stated in the Asplund Case, supra [29 N.M. 129, 219 P. 788]:

"The courts have had frequent occasion to construe the effect of a constitutional amendment which is inconsistent with some remaining provision of the original Constitution, and have uniformly, so far as our investigation discloses, given effect to the later provision as the latest expression of the sovereign will of the people, and as an implied modification pro tanto of the original provision 'of the Constitution in conflict therewith."

Stripped of verbiage unnecessary to construction, the words of the constitutional provision to be construed may be thus stated: "The Legislature may exempt from taxation * * * the property of every honorably discharged soldier, etc. * * * who served in the armed forces of the United States at any time during the period in which the United States was * * * engaged in any war * * * in the sum of two thousand dollars. * * *". (My emphasis.)

Do the words "every * * * soldier, sailor, marine and army nurse" as used in the amended Sec. of Art. 8, adopted in

1921, include "each soldier, etc.," of World War Two; and if those of World War Two, obviously it includes those of World War Three, believed by many thinking people to be imminent, as well as all future wars. If this is answered in the negative I need not go further, as any legislative act is void that purports to grant an exemption from the payment of taxes not specifically authorized by some provision of the state constitution. State ex rel. Attorney General v. State Tax Commission, supra.

It is said that ordinarily that which is implied in the Constitution is as effectual as that which is expressed. Pine Grove Township v. Talcott, 19 Wall. 666, 86 U.S. 666, 22 L.Ed. 227, but there is an exception to this which we recognized in Church of Holy Faith v. State Tax Commission, 39 N.M. 403, 48 P.2d 777. The question involved was the construction of Art. 8, Sec. 3, supra, as to the meaning of "All church property." We quoted with approval from the Supreme Court of the United States, in Chicago Theological Seminary v. People of State of Illinois, 188 U.S. 662, 23 S.Ct. 386, 387, 47 L.Ed. 641, affirming a decision of the Supreme Court of Illinois, in which the Supreme Court stated:

"The rule of construction followed by the supreme court of Illinois in construing this act exempting property from taxation is so well established by this and other courts as scarcely to need the citation of authorities. One or two, however, from this court may be given. Tucker v. Ferguson, 22 Wall. 527, 22 L.Ed. 805; New Orleans City & L. R. Co. v. New Orleans, 143 U.S. 192, 195, 26 L.Ed. 121, 122, 12 S.Ct. Rep. 406; Bank of Commerce v. Tennessee [to] Use of [City of] Memphis, 161 U.S. 134, 40 L.Ed. 645, 649, 16 S.Ct.Rep. 456.

"The rule is that, in claims for exemption from taxation under legislative authority, the exemption must be plainly and unmistakably granted; it cannot exist by implication only; a doubt is fatal to the claim."

It is the claim of appellee that the plain language of the constitutional provision limits the class which the legislature by its terms is authorized to exempt from taxation, to those of that class who had belonged to the armed forces of the United States prior to the adoption of the constitutional provision; that the language "who serve at any time during the period in which the United States was * * * engaged in any war," could only have reference to those who had so served at the time of the adoption of the amendment by the people.

The appellant counters with the contention that the words "any war," includes past, present and future wars; that if the people had intended such limitation the words to express the intent would have been "any past wars."

It is apparent that only a limited number of soldiers, sailors, marines and army nurs-

es (hereafter collectively referred to as soldiers) are entitled to this bounty from the state. Besides being a soldier of the United States armed forces, he must have, (1) received an honorable discharge; (2) he must have served while the nation was regularly and officially engaged in war; (3) he must be the owner of property subject to taxation; and failing these, though he had been decorated with the Congressional Medal of Honor, he has no legal claim against the state.

We come now to the question of whether the phrase "soldiers, etc.," as contemplated by the amended constitutional provision here considered, is further limited by the exclusion of all soldiers of World War Two, owning property subject to taxation, for all others are excluded by its terms.

The intent of the framers of the amendment to the Constitution in question, and the people who adopted it, of course must control. If the language used is plain and unambiguous there is no room for construction. It was written to be understood by the people whose approval was required to constitute it the state's fundamental law; and its words, phrases and sentences should be assumed to have been used in their normal and usual meaning, in the absence of strong reasons that compel a different construction. A. Magnano Co. v. Hamilton, 292 U.S. 40, 46, 54 S.Ct. 599, 78 L.Ed. 1109; Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894, 64 A.L.R. 1434.

"The first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. * * * The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption." Lake County v. Rollins, 130 U.S. 662, 9 S.Ct. 651, 652, 32 L.Ed. 1060.

See Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439.

If we are unable to arrive at a satisfactory meaning by the assumption that the words of the amendment were used in their ordinary and usual meaning, as grammatically arranged, or if there is a doubt, tax exemption being its object, then resort should next be had to its historical setting at the time of its adoption. Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 44 L.Ed. 597; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368.

At the time the amended provision was adopted (1921) there were persons living who served as soldiers in one or more of a number of wars in which the United States had been engaged. The use of the past tense indicates a reference to soldiers who, previously to the adoption of the amendment, had served in the armed forces. The language used indicates that persons who might serve in the future were not included unless the phrase "in any war" necessarily

includes wars past and future. *Keeping in mind the rule that a claim for exemption from taxation must be plainly and unmistakably granted,* I conclude that the soldiers "who served" did not include those who might serve in the armed forces at some future time. The phrase "During the period in which the United States was \* \* \* engaged in any war," has no reference to wars in which the United States might be engaged after the adoption of the amendment; but to any wars in which the United States was engaged before the amendment was adopted; or if it could be so construed, it was not clearly and unmistakably so phrased as that it is free from doubt.

One claiming an exemption from taxation is required to establish clearly and unmistakably that he comes within the favored class. Doubts are resolved in favor of the sovereign. There is more than a reasonable doubt that stands as a bar to appellants' claim that soldiers of World War Two are included among those entitled to this tax exemption, and this doubt I resolve in favor of the state. Church of Holy Faith v. State Tax Commission, supra; Theological Seminary v. Illinois, supra.

The appellee aptly states in his brief:

"What was obviously the common understanding of the people when they adopted the amendment? The question answers itself. They, the people, desired to reward the soldiers who had rendered services in the defense of their country in past wars, as all pertinent language of the amendment restricted its application to wars fought prior to its adoption. The intent of the people was to leave to the future the adjustment of other situations when they should arise. No one contemplated another war, and no provision was made for the soldiers of that war.

"No doubt public sentiment is on the side most favorable to extending the exemption to soldiers of World War II. But, in order to do that, the court must read into the amendment an intent on the part of the people not to be found in the language used, viz.: an intent to extend the tax exemption to all soldiers of all future wars, regardless of time and condition."

The historical setting, as well as the language used, if strictly construed in favor of the state, leads me to the conclusion that Sec. 5 of Art. 8 of the State Constitution, as amended, has no application to soldiers of World War Two, and the district court did not err in so holding. But by a three to three decision (including the learned trial judge) the opposite conclusion has been reached.

The conclusion of the district court was correct and its judgment should be affirmed.

LUJAN, J., concurs.

On Second Motion for Rehearing.

FOWLER, District Judge.

A second motion for rehearing has been presented in this case. It poses no question or proposition which has not been already submitted and disposed of in the decision or in the denial of the first motion for rehearing.

Decision in the case was filed in this court on December 5, 1946, with three members of the court concurring in and two members dissenting from the majority opinion. A motion for rehearing was duly filed. It was denied December 31, 1946, with the same three judges agreeing on and the same two judges dissenting from such denial.

At the time of the decision and the denial of the motion for rehearing, Mr. Justice HUDSPETH was a member of the court and one of the majority who joined in the opinion and in the denial of such motion. On January 1, 1947, he retired from the court and Mr. Justice McGHEE succeeded him. Thereafter the second motion for rehearing was filed. Question has been raised before the court as to the propriety of participation by Justice McGHEE in the determining of the fate of such second application for rehearing.

It will be seen that if each of the four judges who participated in the decision and the action on the first motion for rehearing, and who are yet members of the court as constituted for this case, holds to his former opinion (as each still does), and if the new member participates in the decision as to whether the second motion for rehearing shall be granted or denied, then the actual decision on the motion will be made by one who did not take part in the consideration and decision of the case upon the merits. Should a granting of rehearing result, and if thereafter the new member should join with the dissenting judges in their views, it would follow that the original decision would be withdrawn and another perhaps of opposite effect would be handed down. Such results would flow directly and merely from a change in the make up of the court and the newly acquired voting power of the erstwhile minority, and not from any change of views of the court to whom decision of the case was originally entrusted and by whom it was originally made.

The question is one of first impression in New Mexico so far as a decision is concerned. But until 1936, that is through the territorial years and about two-thirds of the period of our statehood, such question was made practically impossible because of the then existing positive rule of this court that a rehearing "will not be granted or permitted to be argued orally, unless a justice who concurred in the judgment, desires it and a majority of the court so determines." It would seem that a rule so long adhered to might be considered part of

the settled policy of the court in absence of something positive by rule or decision indicating an intention to change it. The above quoted portion of the rule was left out of the rules adopted and made effective January 1, 1936, and the rule makers revised and expanded the paragraph in which it had occurred (Sec. 1, Rule 18, Rules of Appellate Procedure, 1928) with attention evidently centered on defining the content, form and scope of the motion itself (See Sec. 1, Rule 18, Supreme Court Rules, 1936), which subject was quite tersely handled in the paragraph before its revision. The omission of said quoted statement from the rule in 1936 may be accounted for without assuming that it was thereby intended to work a radical change in a policy so long adhered to, and which was and is the rule and policy of the Supreme Court of the United States and apparently of the highest courts of most of our sister states. The fact that those present members of this court who were members of it then recall no discussion or mention of the matter or suggestion of change of policy made at that time, leaves it fair to assume that the omission of the words above quoted was not purposely designed to effect such change.

A distinction must be noted between the instance where a new judge takes part in the ordinary business, and participates in decisions in c pending but not decided before his coming on to the court, and the instance where he would assume the role of "swing man" to determine as to rehearing in a case already decided by the court, as formerly constituted, before he became a member of it. The two instances are not parallel.

■■■ We think the weight of authority, and the better reasoning, supports the conclusion that a judge who takes his place upon a court by succeeding a former judge thereof after said court, as so previously constituted, has rendered judgment and has denied rehearing in a case, cannot with propriety participate in the consideration and determination of a further motion for rehearing in such decided case.

A number of authorities to this effect are collected and cited in the cases of Cordner v. Cordner, 91 Utah 474, 64 P.2d 828, and Gas Products Co. v. Rankin, 63 Mont. 372, 207 P. 993, 24 A.L.R. 294, wherein the Supreme Courts of Utah and Montana each arrive at the same conclusions on the proposition. If it may be said that the case of *Metropolitan Water District, etc., v. Adams,* 19 Cal.2d 463, 122 P.2d 257 (a case decided upon complicated facts and impressed by practice rules of California), announces another conclusion, we are not in accord with it. (Emphasis ours)

The Cordner case, supra, on its facts is on all fours with the case before this court, except that there the first petition for rehearing was involved, and quotation from

it, including quotations therein given, is appropriate:

"After full consideration of the matter, the court as now constituted is unanimously of the opinion that the new member of the court should not participate in the consideration of the petition for a rehearing. For the new member of the court to participate would require that he consider the case on its merits and if, after considering the case, he should be compelled to disagree with the conclusion reached by a majority of the court as constituted at the time the decision was rendered, the ultimate effect would be to reverse the decision made. This question has not heretofore been squarely presented to this court. The effect of the participation of a new member of the court, where the court is evenly divided on the question after the retirement of the former member, would establish a precedent fraught with dangerous implications. * * * if we once make a precedent of this kind, it will in time lead to great abuse; and that parties who have had judgments given against them as this case was, by a divided vote, or by small majorities, will upon a change of a part of the members of the court be induced to try experiments here, for the purpose of producing a different decision of their causes by the votes of new members." People v. Mayor, etc., of City of New York, 25 Wend. (N. Y.) 252, 35 Am.Dec. 669.

"It would be mischievous in a high degree to permit the re-opening of controversies every time a new judge takes his place in the court, thereby encouraging speculation as to the probable effect of such changes upon principles previously declared and enforced in decided cases." McCutcheon, Admr. v. Homer, 43 Mich. 483, 5 N.W. 668, 38 Am.Rep. 212.

"If a re-argument were now allowed, and the former decision reversed, this result would follow, not from a conviction upon the part of the members of the court by which the case was originally heard and determined that the decision was erroneous, nor from the consideration of reasons and arguments not before advanced and considered, but solely from the change in the composition of the court. Under such circumstances, a relaxation of the ordinary rules governing applications for re-argument, would seem to be peculiarly ill-timed. It would, in our opinion, be a violation of proprieties in the administration of justice, which it is the duty of a court to maintain, and would tend to destroy that respect for, and confidence in judicial tribunals, the loss of which every good citizen would deplore." Woodbury v. Dorman, 15 Minn. 341, Gil. 274.

With the principles thus announced we agree.

This question is one of first impression in this court and we are free

to adopt either of the views stated for such situations. The case has been decided by a majority of this court. No one of those who are now members and who participated in the decision has changed his views thereon. We are of the opinion that we should follow the rule of the courts of Utah, Montana, Michigan, New York and Minnesota for guidance of this court in such cases. The reasoning in Cordner v. Cordner, supra, satisfies us that the rule therein followed is correct. Justice Mc-GHEE who heard the argument on the motion being not eligible to take part in a decision thereon for the reasons above stated; and as the four remaining members of this court are equally divided on the question of whether a rehearing should be granted, it follows that failing a majority in favor thereof the motion for rehearing must be overruled. Motion overruled, and it is so ordered.

BRICE and LUJAN, JJ., and A. W. MARSHALL, District Judge, concur.